STATE OF NORTH CAROLINA v. PETER LYNND BARNETTE, JAMES
   ALLEN CASHWELL, SHELLMON HUGHES, GRAHAM ALLEN SMITH,
   BOBBY RAY COLES

No. 15

(Filed 1 December 1981)

### 1. Rape § 1— first degree rape defined

First degree rape is defined as vaginal intercourse by force and against
the will of the victim when the perpetrator employs or displays a deadly
weapon or an article which the victim reasonably believes is a deadly weapon,
inflicts serious bodily injury, or is aided or abetted in the commission of the of-
fense by one or more other persons. G.S. 14-27.2(a).

### 2. Criminal Law § 9— aider and abettor defined

An aider or abettor is a person who is actually or constructively present
at the scene of the crime and who aids, advises, counsels, instigates or en-
courages another to commit the offense. Even though not actually present dur-
ing the commission of the crime, a person may be an aider and abettor if he
shares the criminal intent of the perpetrator and if, during the commission of
the crime, he is in a position to render any necessary aid to the perpetrator.

### 3. Rape § 5— first degree rape—community of unlawful purpose—use of force—sufficiency of evidence

The State's evidence of community of unlawful purpose and of the use of
force was sufficient for the trial court to submit to the jury an issue of defend-
ant's guilt of first degree rape under theories that defendant, acting by himself
or together with a codefendant, employed or displayed a deadly weapon or
that the codefendant aided and abetted defendant by threatening the victim
with a shotgun where it tended to show that the codefendant, while holding a
shotgun, told the victim that they had decided on "something" for her; later,
while defendant was in a bedroom with the victim and the victim was lying on
the bed naked, the codefendant entered the bedroom, forced the victim to put
the shotgun in her mouth and, when she had done so, laughed and left the
room; and defendant then proceeded to have sexual intercourse with the vic-
tim even though she asked him not to do so.

### 4. Rape § 6— instructions—consent induced by fear

The trial court's instruction in a rape case that "consent induced by fear
is not consent at law" was not inadequate in failing to require that the fear be
reasonable and of violence since there is no objective standard of
reasonableness by which the jury must judge consent. Moreover, even if the
reasonableness standard were the rule, further elaboration on the issue of con-
sent would have been unnecessary where the evidence showed that the fear
which induced the victim's submission to intercourse was the threatened use
of a shotgun, which is *per se* a deadly weapon, since a fear engendered by the
use of a *per se* deadly weapon is both reasonable and of violence.

**5. Rape § 6— instructions—consent induced by fear**

The trial court's instruction in a rape case that "consent induced by fear is not consent at law" was not inadequate in failing to instruct that, in order to be convicted, defendant must be found to have known of a codefendant's threats which induced the void consent since defendant could be convicted of first degree rape based in part on the actions of the codefendant upon a showing only that the two shared a common unlawful purpose, *i.e.*, that the two aided and abetted one another in the commission of the crime, and it was not necessary for each to have full knowledge of all acts committed by the other. Nor was the instruction insufficient in failing to require the jury to find that defendant knew of the lack of consent where the evidence was conflicting as to whether the victim physically resisted the assault or whether she encouraged defendant's sexual advances, and no version of the evidence supported the view that the victim was induced by force to consent to defendant's advances without his knowledge.

**6. Rape § 5— first degree sexual offense—aiding and abetting—insufficiency of evidence**

The State's evidence was insufficient to support one defendant's conviction for first degree sexual offense as an aider and abettor where it tended to show that defendant threatened the victim with a shotgun on two occasions, once in the kitchen and once in the bedroom, but there was no evidence that the actual perpetrator was present in the room on either occasion or that he was aware of defendant's actions, since there was no evidence from which it could reasonably be inferred that defendant and the actual perpetrator shared a common purpose to commit a first degree sexual offense.

**7. Rape § 6.1— first degree offense—proof of aiding and abetting—erroneous instruction on second degree offense**

Where the only theory that would sustain defendant's conviction of a sexual offense was aiding and abetting, defendant could only be tried for a first degree sexual offense and the court's instruction on second degree sexual offense was error, since the offense is always first degree when aiding and abetting is proven. G.S. 14-27.4(a) and .5(a).

**8. Rape § 5— insufficient evidence of first degree rape—sufficient evidence of second degree rape**

The State's evidence was insufficient to support defendant's conviction of first degree rape under the theories that a deadly weapon was used or that defendant was aided and abetted in the crime where it tended to show that a codefendant threatened the victim with a shotgun on two occasions, but there was no evidence that defendant was present when the victim was threatened or that defendant knew of the codefendant's actions. However, the evidence was sufficient to justify submission of a charge of second degree rape where it tended to show that defendant had intercourse with the victim although she asked him to leave her alone; that while defendant was on top of her, the victim tried to push him away with her hands on his chest, and when she did so, defendant restrained her arms with his hands; when defendant tried to turn the victim over, she fought him and told him that she had just had a baby; and

State v. Barnette

defendant then turned her so that she was lying on her back and continued the intercourse.

**9. Rape § 7— insufficient evidence of first degree rape—guilty verdict treated as for second degree rape**

When the jury found defendant guilty of first degree rape, it necessarily found facts which would support a conviction of second degree rape, and where there was insufficient evidence of use of a deadly weapon and aiding and abetting which would make the crime first degree rape, the verdict returned by the jury must be considered as a verdict of guilty of second degree rape.

**10. Rape § 6— instruction on consent**

No issue as to consent induced by fear arose on the evidence in this rape case, and a general instruction on the issue of lack of consent was all that was required, where the victim testified that she never consented and that her resistance was overcome by force, and defendant testified that the victim initiated the intercourse and that the intercourse was with her full consent.

**11. Rape § 5— second degree rape—sufficiency of evidence**

The evidence was sufficient to support one defendant's conviction of second degree rape where it tended to show that defendant restrained the victim with his hands to overcome her resistance and will and that he had intercourse with her although she asked him to leave her alone.

**12. Rape § 5— insufficient evidence of first degree sexual offense—sufficient evidence of second degree sexual offense**

The evidence was insufficient to support a conviction of defendant for a first degree sexual offense on the theory that he was aided and abetted where it showed only that another unknown person was present while defendant committed the crime. However, the evidence was sufficient on the elements of sexual offense and force to justify submission of the charge of second degree sexual offense to the jury where it tended to show that defendant forced the victim into a sitting position with her back against the wall, forced her legs apart and held her legs down with his hands and arms while he performed cunnilingus, and the victim asked defendant to leave her alone and resisted him as best she could throughout the assault.

**13. Rape § 7— insufficient evidence of first degree sexual offense—verdict treated as for second degree sexual offense**

In finding defendant guilty of a first degree sexual offense the jury necessarily found as fact all the elements constituting second degree sexual offense, and where the evidence was insufficient to show that defendant was aided and abetted which would make the crime a first degree offense, the verdict of guilty of a first degree sexual offense must be viewed as a verdict of guilty of a second degree sexual offense.

BEFORE *Llewellyn, Judge,* at the 28 April 1980 Criminal Session of Superior Court, NEW HANOVER County. Judgments were entered 6 May 1980.

Defendants were charged in separate indictments, proper in form, with first degree rape, G.S. § 14-27.2, and first degree sexual offense, G.S. § 14-27.4. Upon pleas of not guilty they were tried before a jury. The jury found defendant Barnette guilty of first degree rape, defendant Cashwell guilty of first degree rape, defendant Hughes guilty of first degree rape and first degree sexual offense, defendant Smith guilty of first degree sexual offense and defendant Coles guilty of second degree rape. Barnette, Cashwell and Hughes were sentenced to life imprisonment for their convictions of first degree rape. Hughes also received a life sentence for his conviction of a first degree sexual offense to run concurrently with the sentence imposed for rape. Smith received a sentence of life imprisonment for first degree sexual offense. For his conviction of second degree rape Coles was sentenced to seventeen to twenty years imprisonment. From the life sentences imposed, defendants Barnette, Cashwell, Hughes and Smith appeal to this Court as of right pursuant to G.S. 7A-27 (1981). We allowed defendant Coles's motion to bypass the Court of Appeals on his second degree rape conviction on 8 May 1981.

*Attorney General Rufus L. Edmisten, by Special Deputy Attorney General Ann Reed, for the State.*

*Tharrington, Smith & Hargrove, by Roger W. Smith, for defendant-appellant Barnette; Jack E. Carter for defendant-appellants Cashwell, Hughes, Smith and Coles.*

CARLTON, Justice.

I.

At trial, evidence for the State tended to show that late in the evening on 14 March 1980 Paula Stone Jackson went to the Shamrock Bar and Grill in Castle Hayne with Andy Howard. Jackson noticed some motorcycles parked outside and saw some men in motorcycle attire inside the bar. While there, she struck up a conversation with Robert Wallace, who was not dressed in motorcycle attire. Wallace invited Jackson to a party later that evening and she accepted. Howard then left the bar alone. Jackson then left the bar with Wallace in a van in which two other men and three other women were riding. One of the men was defendant Barnette.

The group in the van drove to another bar. At the second bar were some of the same people who had been at the Shamrock and who were dressed in motorcycle attire. The group had some beer and, after the last call was made, Jackson and the same group left again in the van.

They drove to a trailer in Castle Hayne. According to Jackson, it appeared that the people who lived in the trailer were asleep. The driver of the van got out, awoke the occupants of the trailer and went into the kitchen. Jackson heard one of the other women in the van remark that someone in the trailer had reached into his pocket, and defendant Barnette jumped out of the van and went into the trailer. Later, when Barnette and the driver came back to the van, one of them said "did you see that black person's face when he saw the gun?" and acted as though it was "a big joke."

After leaving the first trailer, the group in the van drove to a trailer in Woodland Trailer Park, the home of the defendant Hughes. They arrived at about 2:00 a.m. Jackson saw motorcycles parked in the yard. She and Wallace went inside. A "few people" were already in the trailer. One man had badly cut his hand and had sealed the wound with a heated knife. None of the people at the party spoke to Jackson except Wallace. She felt that the others did not want her there.

Initially, there were eleven or twelve in the trailer. Thereafter, people were continually entering and exiting the trailer, but there were never more than about ten people in the trailer at one time. The people there were drinking, but Jackson denied that she had anything to drink at the trailer. Mr. Milstead, one of the partygoers, passed out some capsules that were allegedly amphetamines, known as "speed." Both Jackson and Wallace took one.

Within fifteen or twenty minutes Jackson fell asleep in a chair. She awoke to find herself being carried down the hallway by defendant Barnette. Her shirt was torn open and her brassiere was cut. Jackson asked Barnette what he thought he was doing, and he became angry. Jackson went into the bathroom, removed her brassiere and threw it in the trash can. She then returned to the living room. Wallace was just awakening and gave her "a bewildered look" as though he didn't know what was going on.

Within a few minutes, defendant Hughes entered the trailer through the front door carrying a sawed-off shotgun by the handle in his hand. He walked through the living room to the kitchen and told Jackson and Wallace that he wanted to talk to them. They went in the kitchen, and Hughes said to Jackson, "do you remember what you said to me at the Shamrock Grill?" She replied, "No, I don't know." Hughes then stated, "Well, you told me to screw off," to which Jackson replied, "Well, I don't remember saying that. I don't remember even talking to you." Hughes responded, "Well, nobody gets away with talking to me like that." At that point, Hughes pointed the shotgun at her and said, "Well, we have decided on something and you can either fight us or go along with it." Jackson turned to Wallace and he gave her another "bewildered" look.

Hughes turned and left. Wallace and Jackson walked to the bathroom in the back of the trailer to talk. They discussed trying to escape through the bathroom window but did not attempt it because there were people in the back yard. Wallace told her that the back door was bolted. Jackson asked Wallace for help and Wallace told her he could do nothing to help her, that she should not resist because they would hurt her and that he was sorry. Someone knocked on the bathroom door and told them to hurry, and Wallace suggested that he and Jackson go into a bedroom, get in bed, and feign sexual intercourse until the others tired of the idea.

Jackson agreed. She and Wallace went into a bedroom. They were alone. They removed their clothes and got in bed, but they did not have intercourse. Jackson kept asking him what was going to happen and why but Wallace didn't give her any answers. He seemed afraid. Someone opened the door, and Jackson and Wallace embraced. Whoever had opened the door left without comment. Soon, however, someone began knocking on the door. The knocks became more frequent, and Wallace was told to leave the room.

After Wallace left, "another person" came into the room. Jackson could not identify this man because she didn't look at him the entire time he was in the room. The unidentified male removed his clothes, got in bed with Jackson and had intercourse with her. Jackson tried to keep his body off hers and did not consent to the intercourse.

The first man left and defendant Barnette entered the bedroom. He undressed and got in bed. Jackson asked him how many times she would have to go through this, and he said he didn't know. Barnette had intercourse with her. Jackson was certain that Barnette was the second person with whom she had intercourse because he returned to the bedroom twice. During one of his visits Jackson asked him if she could leave and he told her no. He asked Jackson to go to California with him and told her she had a beautiful body. While Barnette was in the room defendant Hughes and another person walked in. Jackson was in bed, lying on her back. Hughes was carrying the shotgun and forced Jackson to put the barrel of the shotgun in her mouth. Hughes then walked out of the room laughing. Barnette then had intercourse with her again.

Jackson testified that sometime during the early morning hours defendant Cashwell entered the bedroom, undressed and had sexual intercourse with her while she was lying on her back. He tried to turn her over and have intercourse while she was lying on her stomach, but she refused. She told him that she had just had a baby and asked him not to do it. He did not force her to lie on her stomach but continued to have intercourse with her while she was lying on her back. Jackson testified that she resisted with her hands: "I would push as much as I could before I was pushed back, or restrained back. I did not embrace or do anything to entice what was going on."

After Cashwell had finished, Barnette re-entered the room and again had intercourse with her. At that time, Jackson was crying.

The next person to enter the room was defendant Coles. He entered the bedroom and told Jackson how good he was going to make her feel. Coles then had sexual intercourse with her. While Coles was in the room or immediately thereafter, someone came in and took Jackson's pocketbook. Later, the pocketbook was brought back and dumped on the floor. Jackson's pants were similarly removed and then returned. All valuables from Jackson's purse and pants were removed.

Defendant Smith entered the room after Coles left. Another man came in with him and sat down across the bedroom. Smith pushed Jackson into a sitting position with her back against the

wall. He separated her legs and held them down. He performed cunnilingus on her while the other person sat and watched. At that time Jackson was bleeding in her vaginal area, and she asked Smith, "What are you trying to do, earn your red wings?" The term "earn your red wings" is one used by motorcycle gangs to refer to cunnilingus performed while the female is having her menstrual period. When Jackson asked Smith this question, the other man in the room laughed. Smith tried to have vaginal intercourse with Jackson but was unable to penetrate. Then, Elizabeth Baker came into the room and told them they had to leave because she had to put her baby to bed. Jackson was allowed to dress and to go to bathroom to clean herself up.

While she was in the bathroom, the man who watched while Smith performed cunnilingus on her, known to Jackson as the "Enforcer," came in and told her not to say anything about what had happened and that he would "take care" of anyone who didn't follow his instructions.

After Jackson cleaned up she left the trailer and went out into the yard. A pig was being cooked, and about twenty people were in the yard. One of the men whom she had seen in the bedroom called her over and asked her to stay for the party. Hughes ordered her to leave, and she turned and began to walk away. Before she got to the road she was jumped by a Ms. Edwards and a Ms. Baker, the woman with the baby, and she fell to the ground. Jackson tried to fight back and yelled that she would fight one of them at a time. Hughes pulled Jackson up from the ground and punched her in the face. She fell back down to the ground and was again told to leave. During the struggle, her shoes had come off and she had lost her purse, and these items were thrown at her as she was leaving.

Jackson stopped at a nearby home and called the police. She had bruises and scratches over her upper body. A vaginal smear taken at the New Hanover Hospital revealed the presence of spermatozoa.

Evidence for the defendants tended to show that the Fayetteville and Wilmington chapters of the Satan's Avengers, a motorcycle gang with which the defendants were associated, were having a "pig-pickin'" at defendant Hughes's home. The Fayet-

etteville chapter arrived around ten o'clock on the evening of March 1980. They went to the Shamrock Bar and Grill with Hughes and other members of the Wilmington chapter. Although not a member of the Satan's Avengers, Wallace was trying to join the Wilmington club and accompanied them to the bar. When they left the bar, Jackson accompanied them. In the van where Hughes, Barnette, Mrs. Milstead (the wife of a club member), Coles, Smith, Wallace and Jackson. They drove to the Portside Bar to have some beer. The bartender there refused to serve Wallace because he was too drunk.

After the last call at the Portside, the group left in search of more beer. They were not able to buy any at a convenience store and drove to a trailer belonging to a friend of Hughes, where they hoped to get some beer. On the way there Jackson and Wallace were lying on the bed in the back of the van, hugging and kissing. After they arrived at the friend's trailer, Barnette went to the back of the van and sat on the bed, and Jackson put her arm around him and hugged and kissed Barnette.

After they had been at the trailer about forty-five minutes, Barnette went inside to get Hughes. While in the trailer he had a beer. The friend gave them two six-packs of beer, and they left to go to Hughes's trailer.

When they arrived, they all went into the living room. Jackson sat on Wallace's lap. She had several drinks, sniffed some white powder through a rolled-up dollar bill and took a black pill.

Hughes testified that he left his home a few minutes after he arrived with the group in order to get the pig cooker and did not return until after 6:00 a.m. The pig cooker was located about thirty miles from Hughes's home, and he made several stops along the way. His alibi testimony was corroborated by three witnesses, one of whom said that Hughes was at his, the alibi witness's, home, some thirty miles from Hughes's trailer, at 5:30 a.m. on 15 March 1980. A convenience store clerk testified that Hughes was at the store at about 3:00 a.m. on 15 March 1980.

Barnette testified that he fell asleep in the living room of Hughes's trailer. He was awakened by someone pulling on his feet and telling him that "the girl" was in the back room. He went back to the bedroom where he found Jackson, nude. He told her that he wasn't ready to do anything, and they talked. He told her he was from Northern California. After a while, Barnette undress-

ed. They engaged in foreplay because Barnette wasn't "up to it" and needed assistance in order to perform. They then had intercourse. At no time did Jackson resist. Barnette left the bedroom, went back to the living room and went to sleep. Later, someone woke him up and told him that Jackson was asking for him. He went to the bedroom, sat on the bed and talked to her. They did not have intercourse. When he left the bedroom he went outside and sat in the yard. Jackson opened the bedroom window and said, "You call yourselves big bad bikers; com (sic) on back in here." It was light by this time. Barnette left with Hughes to buy some beer. They went to the Shamrock Bar and arrived about 7:00 or 8:00 a.m. They bought two cases of beer and returned to the trailer. Barnette then left in search of a beer keg tapper. He drove all over town but could not find one. When he returned to the house, Jackson had already gone.

Barnette stated that no one else was present while he was in the bedroom with Jackson, that Jackson never asked for assistance and that he never saw or heard of Jackson being threatened with a weapon.

Cashwell testified that he was a member of the Fayetteville chapter of the Satan's Avengers and came to Wilmington on 14 March 1980 to attend a "pig-pickin'." He arrived at the Shamrock Bar and Grill in Castle Hayne at about 9:30 or 10:00 p.m. While he was there he saw Jackson enter the bar. He did not see her talking to any members of his group. When he left the bar she was still there. He left with Jimmy Kye, the group's road captain, Smith and Coles. They drove to a place called River Road and dressed out the pig which Cashwell had brought from Fayetteville. While dressing the meat, Cashwell accidentally stabbed Kye in the hand with a buck knife. Blood spurted from the wound. Kye did not wish to go to the hospital, so he and Cashwell went to Hughes's trailer, where Cashwell heated his knife and cauterized the wound. While there, the group from the Shamrock, including Jackson, arrived. Hughes came in the trailer, got a couple of beers and left, saying he was going to get the pig cooker. When Hughes left, Jackson was still in the living room.

She left the living room and went to the back of the trailer about forty-five minutes after Hughes had gone. Wallace was with her. Cashwell went to sleep in the living room.

He was awakened at 4:00 or 4:30 a.m. when someone sat on him. He was very hot and took off two thermal shirts and a flannel shirt. He walked back to the bedroom to put the clothing in his duffle bag, which he had placed in the bedroom earlier. He walked in, saw Jackson and began to back out. She said, "no, come on in. Let's talk." She was lying under a blanket and was nude. She asked Cashwell if he liked anything he saw, to which he replied, "Yes." They talked, and she asked him several times if he wanted to have intercourse. He replied, "not necessarily," because he had been up for the past forty-eight hours getting his motorcycle ready for the trip to Wilmington and was tired. He did, however, engage in intercourse with her assistance. She wrapped her legs around his back and pulled him down closer. No one else was present. When they finished, he dressed, put his shirts in the duffle bag and went back to the living room.

He was awake when Hughes arrived back at the trailer between six and seven o'clock. He never heard Jackson ask for a ride home or for any kind of assistance. She never pleaded with him to leave her alone.

Coles took the stand and admitted that he had had intercourse with Jackson but that it was with her consent and that she initiated it. After they finished he went outside and went to sleep in a van. When he awoke at 10:00 or 10:30 a.m., she was gone.

Smith testified that he had never been with Jackson and had never performed cunnilingus on her. He spent his evening dressing the pigs, going with Hughes to get the pig cooker, and gathering firewood. He saw Jackson leave the trailer on the morning of the fifteenth. When she came out, she called to Wallace, but Wallace walked away because he had his wife or girlfriend with him. Jackson looked hurt. She walked over to the pig cooker. Cricket, Hughes's girlfriend, asked her to leave. They fought, and Hughes separated them and told Jackson to leave.

At the close of all evidence the trial judge denied all defendants' motions to dismiss the charges. He submitted the case to the jury with instructions on first and second degree rape and first and second degree sexual offense. The instructions are the subject of numerous assignments of error and will be more fully set out within the discussion of the assignments.

From verdicts and sentences imposed as set out above defendants appealed to this Court.

## II.

### A. BARNETTE'S APPEAL

Defendant Barnette first contends that the State did not produce sufficient evidence of the crime of first degree rape to warrant submission of that charge to the jury and that his motion to dismiss the charge should have been allowed.

**[1, 2]** In reviewing the denial of the motion to dismiss, this Court must examine the evidence adduced at trial in the light most favorable to the State to determine if there is substantial evidence of every essential element of the crime of first degree rape. *See State v. Wright*, 302 N.C. 122, 126, 273 S.E. 2d 699, 703 (1981). Evidence is "substantial" if a reasonable person would consider it sufficient to support the conclusion that the essential element in question exists. *State v. Smith*, 300 N.C. 71, 265 S.E. 2d 164 (1980); *State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114 (1980). Put another way, we must examine the evidence to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Jones*, 303 N.C. 500, 279 S.E. 2d 835 (1981); *see Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed. 2d 560 (1979). First degree rape is defined as vaginal intercourse by force and against the will of the victim when the perpetrator employs or displays a deadly weapon or an article which the victim reasonably believes is a deadly weapon, inflicts serious bodily injury, or is aided or abetted in the commission of the offense by one or more other persons. G.S. § 14-27.2(a) (1981). An aider or abettor is a person who is actually or constructively present at the scene of the crime and who aids, advises, counsels, instigates or encourages another to commit the offense. *State v. Bell*, 270 N.C. 25, 153 S.E. 2d 741 (1967); *State v. Hargett*, 255 N.C. 412, 121 S.E. 2d 589 (1961); 4 Strong's North Carolina Index 3d, Criminal Law § 9, 9.1 (1976). Even though not actually present during the commission of the crime, a person may be an aider or abettor if he shares the criminal intent of the perpetrator and if, during the commission of the crime, he is in a position to render any necessary aid to the perpetrator. W. LaFave & A. Scott, *Criminal Law* § 63 (1972); R. Perkins, *Criminal Law* 660-61 (2d ed. 1969); 21 Am. Jur. 2d

*Criminal Law* § 169 (1981); *see State v. Jarrell,* 141 N.C. 722, 53 S.E. 127 (1906).

**[3]**  The trial court submitted the first degree rape charge to the jury against Barnette on two alternative theories allowed by the bill of indictment: that Barnette, acting by himself or together with any other defendant employed or displayed a deadly weapon or that defendant Hughes aided and abetted Barnette by threatening the victim with the shotgun. Barnette contends that there is insubstantial evidence under either theory and of the use of force to take the case to the jury.

We disagree. When viewed in the light most favorable to the State, the evidence shows that on one occasion while Barnette was in the bedroom with the victim, Hughes entered and forced her to place the gun in her mouth. Jackson was lying on the bed, naked, covered only by a blanket. After Hughes forced Jackson to put the gun in her mouth, he laughed and left the room. Barnette then forced Jackson to engage in sexual intercourse even though she asked him to leave her alone. These circumstances give rise to a reasonable inference that Hughes helped prepare for the commission of the crime by displaying or employing a deadly weapon in order to overcome the victim's resistance and to enable Barnette to commit the crime. Thus, there is sufficient evidence that Barnette "acting either by himself or acting together with one or more of the other defendants, employed or displayed a shotgun" and that Barnette was aided and abetted by Hughes. The evidence supports a reasonable inference that Barnette shared with Hughes the community of unlawful purpose necessary for aiding and abetting, *see State v. Westbrook,* 279 N.C. 18, 181 S.E. 2d 572 (1971), *death sentence vacated,* 408 U.S. 939 (1972). The trial court properly denied the motion to dismiss.

Defendant Barnette also contends that the evidence was deficient on the essential element of force. He argues that there is no evidence that Jackson was forced to submit to rape. He points out that while there is evidence that Hughes arrayed such physical force as to engender fear of great bodily harm, there is no evidence that the force, the display of a shotgun, was directed against the will of the victim to resist sexual activity.

Barnette is correct in stating that the evidence shows that Hughes never told Jackson that she must submit to intercourse.

The absence of an explicit threat, however, is not determinative. It is enough if the totality of the circumstances surrounding the actions of Hughes gives rise to a reasonable inference that the unspoken purpose of the threat was to force the victim to submit to unwanted sexual contact. The evidence here shows that Hughes entered the bedroom while Jackson was lying on the bed naked. Barnette was also in the bedroom. Jackson had previously been told by Hughes, while holding the gun, that they had decided on "something" for her to do. Hughes forced Jackson to put the gun in her mouth. Barnette made no attempt to stop him. When she had done so, Hughes laughed and left the room. Barnette then proceeded to have intercourse with Jackson although she asked him not to do so. These facts, which also show community of unlawful purpose, give rise to a reasonable inference that the force displayed by Hughes, acquiesced in by Barnette, was intended to make Jackson submit to intercourse. Thus, the evidence of force was sufficient to be submitted to the jury, and the motion to dismiss on this ground was properly denied.

[4] Defendant next argues that the trial court's instructions on lack of consent to the intercourse were inadequate. The trial court instructed the jury that "consent induced by fear is not consent at law." He contends that the instruction failed to require that the fear be reasonable, that the fear be of violence, that the individual defendant either induce the fear or know of its inducement by another, and that the individual defendant know of the lack of consent.

We discuss Barnette's first two contentions together, as it appears to us that they are inextricably related. Barnette concedes that the trial court's instruction on consent is a correct statement of the law, *State v. Henderson*, 285 N.C. 1, 203 S.E. 2d 10 (1974), *death sentence vacated*, 428 U.S. 902 (1976), but contends that it is incomplete. In support of this contention, he cites us to statements contained in prior cases. Indeed, in *State v. Burns*, 287 N.C. 102, 116, 214 S.E. 2d 56, 65, *cert. denied*, 423 U.S. 933 (1975), we stated that "[a] threat of serious bodily harm which reasonably induces fear thereof constitutes the requisite force and negates consent." *Accord, State v. Hall*, 293 N.C. 559, 238 S.E. 2d 473 (1977); *State v. Primes*, 275 N.C. 61, 165 S.E. 2d 225 (1969); *State v. Carter*, 265 N.C. 626, 144 S.E. 2d 826 (1965). In

none of these cases, however, was the jury instructed that in order to be void the consent must have been induced by a reasonable fear of serious bodily harm, and we do not interpret these cases as establishing an objective standard of reasonableness by which the jury must judge consent. Additionally, even if the reasonableness standard were the rule, further elaboration on the issue of consent would have been unnecessary under the facts of this case.

First, the record discloses that the fear which induced Jackson's submission to intercourse was the threatened use of a sawed-off shotgun. Hughes on one occasion pointed it at her and on another forced her to put it in her mouth. A shotgun is *per se* a deadly weapon. When a *per se* deadly weapon is the force used to overcome the victim's resistance, we think that the issues of whether the fear engendered by the deadly weapon is reasonable and whether the fear is of violence are not in issue. If the jury believed that Jackson was threatened with a shotgun, then it follows that the fear engendered was both reasonable and of violence. Thus, the only issue raised by the evidence here was whether Jackson was threatened with a shotgun; instructions that the victim's fear must be reasonable and of violence were unnecessary.

Secondly, the victim testified that she *never* consented to the intercourse, that she resisted, and that resistance was overcome by physical force.

[5] Barnette also contends that the Court erred in failing to instruct that, in order to be convicted, he must be found to have known of Hughes's threats which induced the void consent. We cannot agree. For Barnette to be convicted of first degree rape based in part on the actions of Hughes, it is necessary to show only that the two share a common unlawful purpose, *i.e.*, that the two aid and abet one another in the commission of the crime. It is not necessary for each to have full knowledge of all acts committed by the other. An aider and abettor is fully responsible for the acts of the other done in perpetration of the crime. *State v. Overman*, 269 N.C. 453, 153 S.E. 2d 44 (1967). The trial court fully and adequately instructed on the elements of aiding and abetting; nothing more is necessary.

We also reject Barnette's argument that the perpetrator of the actual rape must have knowledge of the lack of consent. Jackson testified that she never consented, that she resisted his advances and that he overpowered her. Barnette testified that she enticed him into bed. Thus, the testimony presents two possible versions of the facts: that the victim physically resisted the assault and that the victim encouraged Barnette's sexual advances. No version of the evidence supports the view that Jackson had been induced by force to consent to Barnette's advances without his knowledge.

Moreover, we think this assignment also relates more to the element of aiding and abetting and not to the issue of consent. Since Hughes and Barnette were aiding or abetting one another, Jackson's forced consent, if any, induced by Hughes's threats need not be known by Barnette.

We conclude that as to defendant Barnette the instructions were adequate and that the case was properly submitted to the jury.

### B. HUGHES'S APPEAL

Defendant Hughes brings forward challenges to the sufficiency of the evidence on the issue of aiding and abetting and to the jury instructions on consent. With regard to the jury instructions he argues, as did defendant Barnette, that the trial court erred in failing to instruct that the fear which induced the consent must be both reasonable and of violence.

These same assignments were raised by Barnette and we have found no error in his trial. Our discussion of the law and the evidence in considering Barnette's appeal applies with equal force to Hughes's appeal. It is unnecessary to repeat that discussion here. For the reasons stated in our discussion of Barnette's appeal, we find no error in Hughes's conviction of first degree rape.

[6] With regard to defendant Hughes's conviction for first degree sexual offense, however, we conclude that there was insufficient evidence of aiding and abetting the alleged perpetrator of that offense, Graham Smith, and conclude that Hughes's motion to dismiss that charge at the close of all evidence should have been granted.

In its most favorable light, the evidence for the State shows that Hughes threatened Jackson with the shotgun on two separate occasions, once in the kitchen and once in the bedroom. On neither occasion does the record disclose that Smith was present in the room, nor is there any evidence that Smith was aware of Hughes's actions. Although Jackson testified that Hughes initially threatened her in the kitchen, which was adjacent to the living room, she never placed Smith in the living room. There is no evidence from which it can be reasonably inferred that Smith and Hughes shared a common purpose to commit a first degree sexual offense. For this reason, the motion to dismiss the first degree sexual offense charge should have been granted.

[7] Although the trial court instructed the jury on the offense of second degree sexual offense, we conclude that Hughes could be guilty only of the first degree offense and that the submission of the second degree offense was error. Because there is no evidence that Hughes himself committed a sexual offense, the only theory which would sustain a conviction for that crime is aiding or abetting. This is an essential element of a first degree sexual offense only. G.S. § 14-27.4(a) & .5(a) (1981). Under the statute, when aiding and abetting is proven, the offense is first degree; it can never be a second degree offense. *Id.* Thus, Hughes could be tried only for a first degree sexual offense and the instruction on the lesser included offense was error. Because the State's proof was deficient on an essential element of the crime of first degree sexual offense, we conclude that this motion to dismiss should have been granted and reverse his conviction for first degree sexual offense.

## C. CASHWELL'S APPEAL

[8] Defendant Cashwell was convicted of first degree rape and brings forth assignments identical to those urged by Barnette. Like Barnette, Cashwell could be found guilty of first degree rape only if a deadly weapon were used or if he were aided and abetted in the crime. We begin our review of his conviction by an examination of the evidence on these issues.

When Hughes threatened Jackson with the shotgun in the kitchen, they were only a few feet away from the center of the living room. In the living room were a number of people. Hughes spoke in a loud voice; those people in the living room probably

could have heard him. Although Cashwell admitted that he was in the living room when Jackson arrived, there is no evidence that he was in the living room when Hughes threatened Jackson with the shotgun nor can his continued presence in the living room be inferred: Jackson herself testified that people were constantly entering and exiting the trailer.

At the time of Hughes's second threat with the shotgun, only he, Jackson and Barnette were present. There is no evidence from which it can be reasonably inferred that Cashwell knew of Hughes's actions.

With regard to Cashwell, Jackson testified:

[After] Mr. Barnette was in there the first time, I don't know the name of the person who came in next. The one in the black suit. He had reddish hair, small, tiny person, skinny. I did notice him at this time. I don't know what caused me to notice him.

The sun had started to come up or it was brighter in the room or something. Whenever the door would open there would be light from the hallway, and after I realized that I was going to, obviously, be in there for longer, I had started to look at what was coming through the door. Later on, in the morning or in the later hours after I had been in there for a while, the sun did start to come up I could tell who each person was just by the light in the room. At that time, I was feeling disgust. I felt degraded. I felt very sick at that time. The man with the red hair, Mr. Cashwell, is in the Courtroom today, seated the fourth person down. (The witness pointed out Cashwell in the courtroom). When he came in the room, the same thing happened. He undressed and had intercourse with me. He did penetrate me. After the man I have identified as Mr. Cashwell entered the room again, he undressed, just like the others and jumped in the bed and had sexual intercourse with me. I did have intercourse on my back with him. And he tried to turn me over and have intercourse with me another way and I refused. I fought him and told him that — I don't know why I told him that — but I didn't know what to say, I told him I just had a baby and to "please don't do that to me" and he didn't force me in that way. After that transpired, I was then on my back again and intercourse was

State v. Barnette

continued with — at that time, I was positioned just on my back. With my hands, I would push as much as I could before I was pushed back, or restrained back. I did not embrace or do anything to entice what was going on.

During intercourse at this time, I was just laying there. I was feeling disgusted, helpless. No one else was in the room with me when Mr. Cashwell was in the room. When he stopped having intercourse, he left the room.

. . . .

Mr. Cashwell, the fellow over there with the red hair, had been in the room before Mr. Smith had. Mr. Cashwell did not have a weapon of any kind while he was in the room that I know of. As to whether Mr. Cashwell threatened me with any injury while he was in the room with me, when I would try to resist he would forcefully put a restraining arm on me. I do not know whether Mr. Cashwell had all his clothes off when he had intercourse with me. Mr. Cashwell was on top of me when he had intercourse with me. As to what he did to me physically with his arms, I had my hands up against his chest, as I did with more than just him, and when I would try to push him away my arms were restrained. As to whether that was from his weight or his bearing down on me, his hands. Mr. Cashwell did not ever threaten to harm me or beat me up. He did not say that he would kill me or anything like that. Neither Mr. Smith nor Mr. Cashwell beat me, pounded me or pawed you or choked you or anything like that. As to whether I asked Mr. Cashwell to leave me alone, I asked all of them to leave me alone.

Cashwell admitted the intercourse with Jackson but claimed that she initiated it when he came into the bedroom to put away some clothes.

None of this evidence shows that Cashwell, acting by himself or with another person, employed a deadly weapon or that he was aided and abetted. For this reason, the charge of first degree rape should have been dismissed.

Because Cashwell, unlike Hughes, had intercourse with Jackson, we must now consider whether the evidence was sufficient to justify the submission of the charge of second degree rape.

Second degree rape is vaginal intercourse by force and against the will of the victim. G.S. § 14-27.3(a) (1981). Because Cashwell admitted the intercourse, the only question for our consideration is whether, when considered in the light most favorable to the State, there is substantial evidence that the intercourse was by force and against the will of the victim. Jackson testified that she asked him to leave her alone and that, while he was on top of her, she tried to push him away with her hands on his chest. When she did so he restrained her arms with his hands. During Cashwell's visit, he tried to turn her over and she fought him and told him that she had just had a baby. He then turned her so that she was lying on her back and continued the intercourse. In our opinion, this evidence is substantial on every element of second degree rape and justified the submission of that charge.

[9] The sole distinction between the crimes of first and second degree rape is the element of the use of a deadly weapon or aiding and abetting.[1] *Compare* G.S. § 14-27.2(a) *with* G.S. § 14-27.3(a). Otherwise, the elements of the offenses are the same. When the jury found Cashwell guilty of first degree rape, it necessarily found facts which would support a conviction of second degree rape. Because there is insufficient evidence with regard to this defendant on the alternative elements of deadly weapon and aiding and abetting which would make his crime first degree rape, it follows that the verdict returned by the jury must be considered as a verdict of guilty of second degree rape. *See State v. Small,* 301 N.C. 407, 272 S.E. 2d 128 (1980); *State v. Jolly,* 297 N.C. 121, 130, 254 S.E. 2d 1, 7 (1979). To paraphrase *Jolly,*

Hence, leaving the verdict undisturbed but recognizing it for what it is, the judgment upon the verdict of guilty of first degree rape is vacated and the cause is remanded to the Superior Court, New Hanover County, for pronouncement of a judgment as upon a verdict of guilty of second degree rape. The Clerk of the Superior Court, New Hanover County, shall thereupon issue a revised commitment with respect to the revised judgment on the first count in case number 80CRS5873 bearing the same date as the original commit-

---

1. If serious bodily injury is inflicted, the crime is also first degree rape. G.S. § 14-27.2(a) (1981).

ment for first degree rape. The effect will be, and it is so intended, that defendant will receive credit upon the new commitment for all the time heretofore served for first degree rape.

*Id.*

[10]   Cashwell also assigns error to the instructions on consent. However, as with defendant Barnette, no issue as to consent induced by fear arises on the evidence: Jackson testified that she never consented and that her resistance was overcome by force, and Cashwell testified that she enticed him into bed. Thus, a general instruction on the issue of lack of consent was all that was required.

### D. Coles's Appeal

[11]   Defendant Coles was convicted of second degree rape. He challenges the sufficiency of the evidence on the issue of whether the intercourse was by force and against the will of the victim and also assigns error to the instructions on consent.

The evidence of force against Coles is quite similar to that against Cashwell. Indeed, the prosecutrix testified that Coles came into the room, told her how good he was going to make her feel, had intercourse, and left. On cross-examination she testified that Coles restrained her by holding her down with his hands, the same method used by Cashwell. He did not have a weapon and did not threaten or injure her in any way. Additionally, Jackson testified that she asked all of her assailants to leave her alone.

This evidence, taken in the light most favorable to the State, shows that Coles used force, *i.e.,* restrained Jackson with his hands, to overcome her resistance and will and is sufficient to enable a rational trier of fact to conclude that the intercourse was by force and against the will of the victim. Because defendant admitted the intercourse and there is substantial evidence of the remaining element of the crime of second degree rape, the trial court properly submitted that charge to the jury.

[10]   Defendant Coles also assigns as error the instructions on consent. Defendant was found guilty of second degree rape. The jury, therefore, must have found as fact that Coles was not aided or abetted and that a shotgun was not involved. Thus, Coles cannot complain that the judge failed to instruct that he had to know

of Hughes's actions in threatening the victim. When the evidence concerning only the intercourse between Jackson and Coles is considered, there are only two possible versions of the facts. Jackson testified that she never consented and that her resistance was overcome by physical force. Coles, on the other hand, claimed that Jackson initiated the intercourse and that the intercourse was with her full consent. On this evidence, there is no issue as to consent induced by fear or as to whether Coles had to have knowledge of her lack of consent. She either voluntarily consented or resisted, and the jury was fully instructed on that question. Defendant cannot complain that the jury chose to credit Jackson's version of events. We conclude that there was no error in the instructions on consent.

### E. SMITH'S APPEAL

[12]  Defendant Smith was convicted of a first degree sexual offense. Like the other defendants, he challenges the sufficiency of the evidence on the issue of whether Smith was aided and abetted by Hughes and concluded that such evidence was deficient. The question remaining for our consideration is whether there is substantial evidence that Smith was aided and abetted in his act by any other person.

According to Jackson, while Smith was in the bedroom with her, another man, whom she could not identify, was also in the room. He sat and watched the entire incident but never said a word. When Smith completed his act, he and the other man left. This evidence is not sufficient on the issue of aiding and abetting. All it shows is that another person was present while Smith committed the crime. Mere presence is not enough to constitute aiding and abetting; it must also be shown that the alleged aider or abettor knowingly encouraged, instigated or aided Smith to commit the crime. *E.g., State v. Rankin*, 284 N.C. 219, 200 S.E. 2d 182 (1973). Because there is evidence only that another person stood by and watched the commission of the crime, it is not sufficient to show that Smith was aided and abetted, and the trial court erred in failing to dismiss the charge of first degree sexual offense. The judgment imposed on the verdict of guilty of first degree sexual offense must be vacated.

[13]  Under the authority of *Jolly*, we now consider whether the evidence is substantial on all the elements of a second degree sex-

ual offense. A second degree offense differs from a first degree offense only in the absence of the alternative elements of aiding and abetting, use or display of a deadly weapon, or infliction of serious bodily injury. *Compare* G.S. § 14-27.4(a) *with* G.S. § 14-27.5(a). Thus, if the evidence, viewed in the light most favorable to the State, would allow a reasonable person to conclude that Smith performed a sexual act, cunnilingus, upon Jackson by force and against her will, it would support a verdict of guilty of a second degree sexual offense.

Jackson testified that Smith entered the bedroom, forced her into a sitting position with her back against the wall, forced her legs apart and held her legs down with his hands and arms while he performed cunnilingus. Jackson asked him to leave her alone and resisted him as best she could throughout the assault. This evidence is sufficient on both the element of a sexual act and the element of force and justifies the submission of the charge of second degree sexual offense to the jury. Because in finding defendant Smith guilty of a first degree sexual offense the jury necessarily found as fact all the elements constituting second degree sexual offense, and the evidence is insufficient on the element which would make it a first degree offense, the verdict of guilty of a first degree sexual offense must necessarily be viewed by this Court as a verdict of guilty of a second degree sexual offense.

Smith's assignments of error with regard to the consent instruction may be disposed of similarly to Coles's corresponding assignments. Jackson testified that she never consented to the act and that her resistance was overcome by force. Smith denied that he had performed cunnilingus on Jackson and also denied that he was ever in the bedroom with her. There is no evidence that Jackson consented to the act whether through fear or on her own volition. Therefore, the only instruction necessary was that Jackson must not have consented to the sexual act; further explanation was unnecessary.

Because we find no error with regard to the charge of second degree sexual offense, we leave the verdict undisturbed but recognize it as a verdict of guilty of the lesser included offense, vacate the judgment imposed upon the verdict of guilty of first degree sexual offense, and remanded the cause to the Superior

Court, New Hanover County, for pronouncement of judgment as upon a verdict of guilty of second degree sexual offense. The Clerk of the Superior Court, New Hanover County, shall thereupon issue a revised commitment with respect to the revised judgment on the second count in case number 80CRS5869 bearing the same date as the original commitment for first degree sexual offense. The effect will be, and it is so intended, that defendant will receive credit upon the new commitment for all time heretofore served for first degree sexual offense.

### III.

In conclusion, we find no error in the first degree rape conviction of Hughes and Barnette and in the second degree rape conviction of Coles; we reverse the conviction of Hughes for first degree sexual offense; we affirm the verdicts entered against Cashwell and Smith, vacate the judgments and remand with instructions to enter judgment on a lesser included offense.

As to defendant Barnette's conviction of first degree rape — No error.

As to defendant Hughes's conviction of first degree rape — No error.

As to defendant Hughes's conviction for first degree sexual offense, we find that the motion to dismiss should have been granted and order the verdict and judgment vacated and the action dismissed — Reversed.

As to defendant Cashwell's conviction of first degree rape — Remanded for Judgment as for Verdict of Guilty of Second Degree Rape.

As to defendant Coles's conviction of second degree rape — No error.

As to defendant Smith's conviction of first degree sexual offense — Remanded for Judgment as for Verdict of Guilty of Second Degree Sexual Offense.