STATE OF NORTH CAROLINA v. KENNETH EARL BELTON AND EUGENE
WELDON SADLER, JR.

No. 693A84

(Filed 29 August 1986)

1. **Criminal Law § 92.2— multiple charges against two defendants—joinder proper**

The trial court did not err in joining for trial kidnapping, rape, robbery
and sex offenses against two defendants, and there was no merit to one de-
fendant's contention that joinder deprived him of a fair trial in that (1) the
other defendant's defense was antagonistic to his because he relied on the
weakness of the State's case while the codefendant relied on an affirmative de-
fense which included evidence of an alibi; (2) the codefendant's testimony "im-
plicated" defendant in the crimes by placing him in possession and control of
the vehicle stolen from the victim, "impliedly" calling into question defendant's
silence; (3) joinder forced defendant to "have to suffer the incredibility and im-
plausibility of [the codefendant's] account"; and (4) the codefendant's testimony
connecting him to the stolen vehicle was applicable only to him, and only the
codefendant's testimony directly connected defendant to the vehicle. N.C.G.S.
§ 15A-926(b)(2) and (c)(2).

2. **Rape § 5— rape by defendant—simultaneous rape by codefendant—conviction
for both crimes supported by evidence**

Evidence was sufficient to convict defendant both for the rape he com-
mitted and for the simultaneous rape his codefendant committed some twenty
feet away where the evidence tended to show that defendants committed all
the crimes against both victims pursuant to a common plan or purpose; to-
gether they kidnapped the victims whom they had earlier agreed to sexually
molest; after the rapes and sex offenses were completed, defendants left
together in a stolen vehicle which they used together until they were arrested;
and having acted in concert throughout their criminal rampage, each was
guilty of all crimes committed by either.

3. **Criminal Law § 46.1— flight of defendants—evidence and instructions proper**

The trial court properly admitted evidence and instructed the jury con-
cerning defendants' flight from a law enforcement officer immediately before
their arrest, and there was no merit to one defendant's contentions that he did
not know that the officer was a police officer or that he ran instinctively only
because his codefendant ran; furthermore, even if defendants might have had
other reasons for fleeing than consciousness of guilt for the crimes for which
they were being tried, this went only to the weight, not the admissibility of,
the evidence of flight.

4. **Constitutional Law § 60; Jury § 7.14— exclusion of blacks from jury—failure
of defendant to show racial discrimination**

There was no merit to defendants' contention that the State deliberately
excluded qualified black men and women from the petit jury solely on the

State v. Belton

basis of their race through the exercise of peremptory challenges because the case involved black men charged with raping and kidnapping white women since the State challenged six black and five white prospective jurors; four black jurors and eight white jurors finally sat on the petit jury of twelve, a result which closely paralleled the racial make-up of Cumberland County where the jurors were chosen; as for alternate jurors, the State challenged two blacks and passed one; one black and one white alternate sat; and the challenges complained of affirmatively demonstrated that concerns other than race must have motivated the prosecutor.

5. **Constitutional Law § 34; Kidnapping § 1— convictions for first degree kidnapping and first degree rape—rape used as element of kidnapping—double jeopardy**

The constitutional prohibition against double jeopardy precluded defendants from being convicted for both the first degree kidnapping and first degree rape of two victims, since the rape of one victim was the only sexual assault which could have formed the sexual assault element of the first degree kidnapping convictions involving her, and since defendants were indicted for and convicted of only one rape of the other victim, though the evidence tended to show that the victim was raped twice and forced to perform fellatio, but the court could not assume that the jury, without being instructed that it could do so, found unanimously beyond a reasonable doubt that defendants in fact committed a rape against the victim for which they were not indicted and that it used the unindicted rape to supply the sexual assault element in the crime of first degree kidnapping of the second victim.

6. **Rape § 6— use of deadly weapon or defendants aiding and abetting each other—instruction in the disjunctive not improper**

In a prosecution for first degree rape and first degree sex offense where the trial court instructed that, if in the rapes and sex offenses defendants employed a deadly weapon *or* were aided or abetted by another, they could be found guilty of first degree rape and first degree sex offense, there was no merit to defendants' contention that the charge given in the disjunctive enabled the jury to render a nonunanimous verdict.

7. **Kidnapping § 1.2— asportation of victims—sufficiency of evidence to support first degree kidnapping conviction**

Evidence that defendants, at gunpoint, confined, restrained and removed their victims for some length of time while they drove from a military reservation to Eureka Springs in Cumberland County where they raped and otherwise sexually assaulted their victims was sufficient to support a conviction of defendants for first degree kidnapping, and the confinement, restraint and removal was not an integral part of or inherently necessary for the commission of the crimes of rape and first degree sex offense of which they were also convicted.

Justice MARTIN dissenting in part.

Justices MEYER and MITCHELL join in the dissenting opinion.

Justice MEYER dissenting in part.

APPEAL by defendants pursuant to N.C.G.S. § 7A-27(a) from judgments imposing life sentences entered on 7 September 1984 by *Johnson (Lynn), J.*, after a joint jury trial at the 29 August 1984 Criminal Session of CUMBERLAND County Superior Court. Belton's petition to bypass the Court of Appeals with regard to a judgment imposing a twenty-year sentence allowed on 13 February 1985.

*Lacy H. Thornburg, Attorney General, by David E. Broome, Jr., Assistant Attorney General, for the state.*

*Adam Stein, Appellate Defender, by Gordon Widenhouse, Assistant Appellate Defender, for defendant appellant Belton.*

*James R. Parish for defendant appellant Sadler.*

EXUM, Justice.

This appeal raises questions involving (1) the propriety of joining defendants for trial; (2) the sufficiency of the evidence to show aiding and abetting; (3) the admissibility of evidence of and instructions on flight; (4) whether the state's peremptory challenges of certain black jurors unconstitutionally deprived defendants of a representative jury; (5) whether defendants' rights under the constitutional prohibition against double jeopardy were violated; (6) whether a jury instruction in the disjunctive violated defendants' rights to a unanimous verdict; and (7) whether there was sufficient evidence of kidnapping. We find a violation of defendants' rights under the constitutional prohibition against double jeopardy and remand for a new sentencing hearing. Otherwise we find no error in the trial.

I.

Each defendant was tried upon a multi-count bill of indictment[1] charging him with two counts of kidnapping, two counts of first degree rape, two counts of armed robbery, and one count of first degree sex offense.

The state's evidence adduced at trial tended to show: On the evening of 21 May 1983, Doris Nunnery and Rebecca White, both white females in their twenties, left Raeford, North Carolina, in

---

1. Belton's indictment is case No. 83CRS23571; Sadler's, No. 83CRS23581.

Nunnery's 1979 brown Toyota Celica and went to the Dragon Club, a nightclub located on the military reservation at Fort Bragg, North Carolina. At the Dragon Club a black male armed with a pistol ordered both women into the Toyota. A second man armed with a sawed-off shotgun appeared. One of the men ordered White to get in the back seat behind the driver's seat, and she complied. The assailant with the pistol, later identified as Belton, told Nunnery to get in the front passenger's seat, and he himself got in the driver's seat. As they left the Dragon Club's parking lot, the driver handed his pistol to his accomplice in the rear seat, later identified as Sadler, who held both guns on White the entire time the four were in the car. While en route, the women asked their assailants what they wanted. When one man replied that they wanted money, the women told them to take the car, their money, or anything else, and pleaded with the men to release them.

After traveling through rural areas several miles from Fort Bragg for twenty to thirty minutes, the four stopped on a deserted dirt road in the vicinity of Eureka Springs. Belton ordered the women to remove their clothing. Sadler in the rear seat then returned the driver's pistol to him. The women again asked to be released unharmed, and the men replied they would be released, but not before they had sexual relations with the men.

Belton told Sadler to get out of the car and told White to follow him. Sadler took White into a wooded area approximately twenty feet from the car. While aiming his shotgun at her, he made her lie down on the ground where he engaged, without her consent, in sexual intercourse. Still holding his shotgun on White, he made her perform fellatio on him, and then engaged in sexual intercourse a second time. During White's ordeal, Belton confined Nunnery in the automobile. While holding his pistol on her, he engaged in sexual intercourse with her against her will.

The two men left in Nunnery's car, which contained some of the women's clothing and their pocketbooks containing wallets, cash, credit cards, photographs, identification, and makeup. A baby carriage was stored in the trunk.

White succeeded in flagging down a motorist, who took the two women to a nearby phone booth where they telephoned for and ultimately received help.

On 1 June 1983, Detective Alfred F. Payne of the Spring Lake Police Department went to a duplex located at 410 Lake Avenue near where a brown Toyota Celica automobile bearing a Virginia license plate was parked. Detective Payne noticed clothes in a dry cleaner's bag hanging on a hook inside the car with a ticket bearing the name "E. Sadler." He went to the rear of the duplex where he radioed for assistance and saw defendants Belton and Sadler, whom he knew, crossing a trailer park on the other side of a chain link fence from where he was standing. When defendants saw Payne they ran in the other direction. After a brief chase, other Spring Lake police officers apprehended defendants. The Toyota automobile belonged to Nunnery. It contained a sawed-off shotgun, a shotgun shell, and clothing belonging to Sadler. The Virginia license plate affixed to it was stolen. The car's odometer showed approximately 5,000 miles more than when Nunnery had last driven it.

Later that day, Nunnery viewed a live lineup in which she identified defendant Belton as her assailant. The next morning, White independently identified defendant Sadler in another lineup as her assailant. Neither victim was able to identify the other victim's assailant in the lineups.

Defendant Belton presented no evidence.

Defendant Sadler testified that he was playing cards with friends in Spring Lake on the evening of 21 May 1983 until 11:30 p.m. or midnight, when he and Belton left. Other witnesses corroborated this testimony. Sadler said he and Belton hitchhiked to the trailer park where they were to meet a man named Jackson and borrow a car from him so Belton could drive his girlfriend to Miami. They borrowed a brown Toyota Celica with a Virginia license plate, paying Jackson $100 to use the car. Belton and Sadler then picked up Belton's girlfriend at about 4 a.m. in Spring Lake and drove to Miami, where they stayed for three days. Upon their return to North Carolina, they paid Jackson another $50, kept the car and remained in Cumberland County until their arrest. Sadler denied stealing the car or knowing that the car was stolen, and denied ever possessing or owning the sawed-off shotgun. Other defense witnesses testified that defendants did not attempt to conceal the Toyota.

The state presented testimony in rebuttal that Alvin Renna Jackson, the person Sadler indicated loaned defendants the Toyota automobile, was 5 feet 4 inches tall, considerably shorter than the victims' descriptions of either perpetrator. Jackson was unavailable to testify at trial.

The jury found each defendant guilty as charged. It found Sadler guilty of first degree kidnapping, first degree rape, and armed robbery of both victims White and Nunnery. It also found him guilty of a first degree sex offense against White. The jury found defendant Belton guilty of first degree kidnapping, first degree rape, and armed robbery of both victims White and Nunnery. It also found him guilty of a first degree sex offense against White. Theories of aiding and abetting were used to convict Belton in the rape and sex offense Sadler personally committed against White and to convict Sadler of the rape Belton personally committed against Nunnery.

Judge Johnson consolidated for judgment both of Belton's kidnapping convictions with his rape conviction against White and sentenced him to life imprisonment. He also consolidated for judgment Belton's rape conviction against Nunnery and his first degree sex offense conviction against White and sentenced him to a second life term, to begin at the expiration of the first. Finally he consolidated for judgment both of Belton's armed robbery convictions and sentenced him to twenty years' imprisonment to begin at the expiration of his second life sentence. Judge Johnson consolidated for judgment both of Sadler's kidnapping convictions with his rape conviction of White and sentenced him to life imprisonment. He then consolidated for judgment both of Sadler's armed robbery convictions with his conviction for the rape of Nunnery and the sex offense against White and sentenced him to a life term to begin at the expiration of the first life sentence.

We first consider assignments of error advanced only by defendant Belton. Next we consider those assignments advanced by both defendants, defendant Sadler not having made any arguments not also made by defendant Belton.

II.

A.

[1] Defendant Belton first challenges the joinder of his and Sadler's trials. He moved before trial and made repeated motions

during trial for severance, all of which were denied, and moved for mistrial because the severance motions were not granted. Belton argues these rulings deprived him of a fair trial. He claims the joint trial deprived him of the presumption of innocence and his right to rely on the weaknesses of the state's case and forced him "tacitly to accept the [defense] theory of defendant Sadler regardless of [Belton's] faith in either its veracity, merit, or potential for success." We conclude there was no error in joining these defendants for trial nor in denying Belton's motion for severance or mistrial.

The rules for permissible joinder of cases for trial are set out in N.C.G.S. § 15A-926. Subsection (b)(2) of this statute provides:

Upon written motion of the prosecutor, charges against two or more defendants may be joined for trial:

a. When each of the defendants is charged with accountability for each offense.

Here since each defendant is charged with accountability for each offense, the statutory prerequisites for joinder are present.[2] Defendant Belton does not contend to the contrary.

Belton's argument is, rather, that his motions for severance should have been granted pursuant to N.C.G.S. § 15A-927(c)(2) as "necessary to promote a fair determination of [his] guilt or innocence." *Id.*

Where two or more defendants are sought to be held accountable for the same crime or crimes, not only is joinder permissible under the statute, but "public policy strongly compels consolidation as the rule rather than the exception." *State v. Nelson,* 298 N.C. 573, 586, 260 S.E. 2d 629, 639 (1979), *cert. denied sub nom. Jolly v. North Carolina,* 446 U.S. 979, 64 L.Ed. 2d 282 (1980); *accord, Parker v. United States,* 404 F. 2d 1193, 1196 (9th Cir. 1968), *cert. denied,* 394 U.S. 1004, 22 L.Ed. 2d 782 (1969). When joinder is permissible under the statute, whether to sever trials or to deny joinder is a question lodged within the discretion of the trial judge whose rulings will not be disturbed on appeal

---

2. Although the record does not affirmatively show it, we assume the appropriate written motion for joinder was made by the prosecutor. Defendant Belton does not contest the joinder on the ground such a motion was not made.

unless it is demonstrated that joinder deprived defendant of a fair trial. *State v. Boykin,* 307 N.C. 87, 90, 296 S.E. 2d 258, 260 (1982); *State v. Alford,* 289 N.C. 372, 222 S.E. 2d 222 (1976). "Absent a showing that a defendant has been deprived of a fair trial by joinder, the trial judge's discretionary ruling on the question will not be disturbed." *State v. Nelson,* 298 N.C. at 586, 260 S.E. 2d at 640; *accord, State v. Fox,* 274 N.C. 277, 163 S.E. 2d 492 (1968).

Belton claims joinder deprived him of a fair trial for several reasons. First, he says Sadler's defense was antagonistic to Belton's because Belton relied on the weakness of the state's case and Sadler on an affirmative defense which included evidence of an alibi. Second, Belton argues that Sadler's testimony "implicated" Belton in the crimes by placing Belton in possession and control of the vehicle stolen from the victim, "impliedly" calling into question Belton's silence. Third, Belton says joinder forced Belton "to have to suffer the incredibility and implausibility of Sadler's account." Finally, Belton argues that Sadler's testimony connecting Sadler to the stolen Toyota was applicable "only to Sadler," and only Sadler's testimony directly connected Belton to the Toyota.

Recognizing that the propriety of discretionary joinder rests ultimately "upon the circumstances of each case," *State v. Nelson,* 298 N.C. at 586, 260 S.E. 2d at 640, we are completely satisfied that there are no circumstances here which demonstrate that joinder deprived Belton of a fair trial. Mere inconsistencies in defenses do not necessarily amount to the kind of antagonism between defendants joined for trial that deprives one or the other of a fair trial. *Id.* at 573, 260 S.E. 2d 629. Rather, the defenses must be "so irreconcilable that 'the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty' . . . [or] so discrepant as to pose an evidentiary contest more between defendants themselves than between the State and the defendants . . . [resulting in a] spectacle where the State simply stands by and witnesses 'a combat in which the defendants [attempt] to destroy each other.' " *Id.* at 587, 260 S.E. 2d at 640.

This case presents none of this kind of antagonism between defendants. Indeed, we perceive no real antagonism at all between defendants at trial. Sadler's testimony tended to exculpate

both defendants and was, on its face at least, favorable to both Sadler and Belton. Belton got the benefit of it without having to testify and subject himself to cross-examination. Although the jury chose ultimately not to believe it, Sadler's version of the events was not on its face so inherently implausible that Sadler's very telling of it deprived Belton of a fair trial. Neither was Sadler's testimony all that directly connected Belton with the stolen vehicle. The victims of the crimes positively identified both Belton and Sadler as their assailants and the thieves who took the car. Rather than being all that implicated Belton in the theft of the car, Sadler's testimony was all that explained how he and Belton might have gained possession of the car in a lawful manner rather than in the unlawful manner described by the victims of the crimes. Finally, Belton was not forced to accept Sadler's story tacitly or otherwise. Belton had a right to tell his own story, a right which for whatever reason he freely chose not to exercise.

Belton relies on *State v. Boykin*, 307 N.C. 87, 296 S.E. 2d 258, and *State v. Alford*, 289 N.C. 372, 222 S.E. 2d 222, in support of his argument that joinder of his cases with those of Sadler deprived him of a fair trial. In both *Boykin* and *Alford* this Court found error in the consolidation and awarded defendants new trials. Both cases are easily distinguishable. In both *Boykin* and *Alford* this Court concluded that joinder of trials against two defendants prevented one of the defendants from offering exculpatory evidence which would have been available had the cases not been joined. This record does not indicate that joinder precluded Belton from offering exculpatory evidence which would have been available had he been tried separately.

B.

[2] Defendant Belton assigns error to the trial court's denial of his motion to dismiss for insufficiency of evidence the charges of first degree rape and first degree sex offense committed against White. He argues the evidence was insufficient to show that Belton aided and abetted Sadler in committing these crimes against White because it tended to show only that Sadler committed these crimes some twenty feet from Nunnery's automobile where, simultaneously, Belton was raping Nunnery.

We disagree, finding *State v. McKinnon*, 306 N.C. 288, 293 S.E. 2d 118 (1982), controlling on this point. McKinnon was con-

victed both for the rape he committed and for the simultaneous rape his cohort Andrew Rich committed nearby. McKinnon, Rich, and others had approached a group of three males and two females who were seated in a parked car. The armed assailants ordered all the victims to disrobe, robbed them of personal belongings, and separated the males from the females. Rich then proceeded to rape one of the females while McKinnon raped the other. McKinnon argued the trial court erred in denying his motions to dismiss the charges against him of rape of Rich's victim on the ground the evidence was insufficient to show he aided and abetted Rich. We rejected McKinnon's argument saying:

> Evidence for the State was plenary that defendant was not only present at the scene of the crimes committed by Andrew Rich but that he was actively aiding, encouraging and participating in the robbery of all the victims, the stripping of their clothes and the removal of the girls to an area separate from the male victims where the sex crimes took place. The evidence indicates that defendant and Rich were in close proximity to one another while Angela Graham was being sexually assaulted. Both defendants ordered the girls to remove their clothes and both had firearms in their possession. McCoy testified that Rich and defendant had the firearms 'drawed on *them*.' (Emphasis added.) Clearly, defendant was an active participant in the crimes committed against Graham by Rich. Thus, there is sufficient evidence that defendant and Rich shared the community of unlawful purpose necessary for aiding and abetting.

*McKinnon,* 306 N.C. at 299, 293 S.E. 2d at 125.

So it is here. After defendants and their victims arrived in the car at the deserted place on a dirt road Belton, who was driving, asked Sadler in the back seat whether they were going to do what they had planned. Sadler replied that they did not have time; whereupon Belton said, "Hell yes, we are, too." Belton then ordered both women to undress, told Sadler to get out of the car and told the victim White to follow Sadler. Some twenty feet from the car Sadler raped and committed a first degree sex offense against White.

"An aider or abettor is a person who is actually or constructively present at the scene of the crime and who aids, advises,

counsels, instigates or encourages another to commit the offense."
*State v. Barnette*, 304 N.C. 447, 458, 284 S.E. 2d 298, 305 (1981).
Obviously the evidence was enough to permit a jury reasonably
to infer that Belton was both present at the scene, and instigated
and encouraged the sexual assaults Sadler committed against
White.

We are buttressed in our view by another decision in which
this Court held:

> It is not, therefore, necessary for a defendant to do any par-
> ticular act constituting at least part of a crime in order to be
> convicted of that crime under the concerted action principle
> so long as he is present at the scene of the crime and the evi-
> dence is sufficient to show he is acting together with another
> who does the acts necessary to constitute the crime pursuant
> to a common plan or purpose to commit the crime.

*State v. Joyner*, 297 N.C. 349, 357, 255 S.E. 2d 390, 395 (1979).

Clearly defendants Sadler and Belton committed all the
crimes against both victims pursuant to a common plan or pur-
pose. Together they kidnapped the victims, and they had earlier
agreed to sexually molest them. After the rapes and sex offenses
were completed, defendants left together in the stolen vehicle,
which they used together until they were arrested. Having acted
in concert throughout their criminal rampage, each is guilty of all
crimes committed by either.

We therefore overrule this assignment of error by Belton.

III.

A.

[3] Both defendants assign as error the trial court's admission of
evidence and jury instructions concerning their flight from a law
enforcement officer immediately before their arrest. At trial,
Spring Lake Police Detective Al Payne testified for the state that
while he was investigating Nunnery's Toyota parked near 410
Lake Avenue in Spring Lake, he observed defendants approach-
ing him from the other side of a four-foot high chain link fence.
When they spotted Payne, defendants ran. Other police officers
apprehended the pair minutes later. Defendant Belton in his brief

claims this evidence is irrelevant because he was unaware at the time that Payne was a law enforcement officer and instinctively followed Sadler. Payne had questioned Sadler previously on unrelated charges of breaking and entering. Defendant Sadler, who had testified, "We thought he was coming to arrest us about the B & E so we took off," claims the evidence of flight pertains only to the above-mentioned unrelated break-ins and thus is not probative evidence of guilt of the crimes charged herein.

As for Belton's arguments, there is no evidence to support them. The record contains no evidence that Belton did not know Payne was a police officer or that he ran instinctively only because Sadler ran. There is, indeed, evidence that Payne had arrested Belton's brother "a couple of days before" the flight on a charge of larceny. But even if Sadler and Belton might have had other reasons for fleeing than consciousness of guilt for the crimes for which they were being tried, this goes only to the weight, not the admissibility of, the evidence of flight. *State v. Irick*, 291 N.C. 480, 231 S.E. 2d 833 (1977). Irick contended evidence of his alleged flight from police could pertain to his operation at the time of a reportedly stolen vehicle, rather than to his knowledge of and participation in certain burglaries, which he denied. This Court said:

> Defendant's position is not the law in this jurisdiction. So long as there is some evidence in the record reasonably supporting the theory that defendant fled after commission of the crime charged, the instruction is properly given. The fact that there may be other reasonable explanations for defendant's conduct does not render the instruction improper. *See* *State v. Lampkins*, 283 N.C. 520, 196 S.E. 2d 697 (1973).

> In North Carolina evidence of flight does not create a presumption of guilt but is only some evidence of guilt which may be considered with the other facts and circumstances in the case in determining guilt.

*Id.* at 494, 231 S.E. 2d at 842.

Although proof of flight, standing alone, is never sufficient to establish guilt, *id.*, the evidence of flight and the instruction pertaining thereto were properly submitted for the jury's consideration and evaluation. We therefore overrule this assignment of error by both defendants.

### B.

[4] Defendants claim the state deliberately excluded qualified black men and women from the petit jury solely on the basis of their race through the exercise of peremptory challenges because this case involves black men charged with raping and kidnapping white women. Both defendants argue that Judge Johnson committed reversible error in denying their motion for a mistrial based on this procedure, which they claim violated their rights under the North Carolina and United States Constitutions to a jury drawn from a fair cross-section of the community.

Defendants rely solely on the fact that the state used eight of its fourteen peremptory challenges, including challenges to alternates, to excuse black jurors. The record reveals the following: When voir dire for jury selection began, the jury box consisted of six whites and six blacks. The state challenged three black jurors peremptorily and passed three. Belton peremptorily challenged one of the three black jurors passed by the state but this juror was replaced by a black who ultimately was accepted by all parties. Later defendant Belton peremptorily challenged another black juror passed by the state in seat number nine, but again a black juror passed by all parties ultimately sat in this seat. In all, not including alternates, twelve black jurors were ultimately tendered to the state. Of these the state peremptorily challenged six and passed six. The state peremptorily challenged five white jurors. Four black jurors and eight white jurors finally sat on the petit jury of twelve. In the selection of two alternate jurors, three blacks were called. The state peremptorily challenged two and passed one. The state also peremptorily challenged one white prospective alternate. One black and one white alternate ultimately were seated. In the selection of both the petit jury of twelve and the two alternate jurors, the state peremptorily challenged eight blacks and passed seven. It peremptorily challenged six white jurors.

Since this case was argued in this Court, the United States Supreme Court has held:

Just as the Equal Protection Clause forbids the States to exclude black persons from the venire on the assumption that blacks as a group are unqualified to serve as jurors . . . so it forbids the States to strike black veniremen on the assump-

tion that they will be biased in a particular case simply because the defendant is black.

*Batson v. Kentucky*, 476 U.S. ---, ---, 90 L.Ed. 2d 69, 88 (1986). *Batson* also established a procedural framework for determining whether the state's peremptory challenges were based on the view that black jurors were unqualified simply because they were black. Under this framework,

> a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group, *Castaneda v. Partida*, [430 U.S. 482] at 494, 51 L.Ed. 2d 498, 97 S.Ct. 1272, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' *Avery v. Georgia*, [345 U.S. 599] at 562, 97 L.Ed. 1244, 73 S.Ct. 891. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

*Id.* at ---, 90 L.Ed. 2d at 87-88.

*Batson* overruled *Swain v. Alabama*, 380 U.S. 202, 13 L.Ed. 2d 759, *reh'g denied*, 381 U.S. 921, 14 L.Ed. 2d 442 (1965). *Swain* had held that in a single, given case peremptorily challenging blacks merely because of membership in the group was not a denial of equal protection. The *Swain* Court noted that peremptory challenges were often

> exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty . . . . Hence veniremen are not always judged solely as individuals for the purpose of exercising peremptory challenges. Rather they are challenged in light of the limited

knowledge counsel has of them, which may include their group affiliations, in the context of the case to be tried.

380 U.S. at 220-21, 13 L.Ed. 2d at 772-73. The Court in *Swain* said:

> With these considerations in mind, we cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws. In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause. To subject the prosecutor's challenge in any particular case to the demands and traditional standards of the Equal Protection Clause would entail a radical change in the nature and operation of the challenge. The challenge, *pro tanto*, would no longer be peremptory, each and every challenge being open to examination, either at the time of the challenge or at a hearing afterward. The prosecutor's judgment underlying each challenge would be subject to scrutiny for reasonableness and sincerity. And a great many uses of the challenge would be banned.

*Swain*, 380 U.S. at 221-22, 13 L.Ed. 2d at 773.

The Court in *Swain* said that in any particular case there was a presumption that the state was using its peremptory challenges "to obtain a fair and impartial jury to try the case before the court," 380 U.S. at 222, 13 L.Ed. 2d at 773. This presumption could not be overcome "by allegations" that all blacks were removed from the jury or that they were removed because they were blacks. "Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it." 380 U.S. at 222, 13 L.Ed. 2d at 773-74. The *Swain* Court referred to its decision as follows:

> We have decided that it is permissible to insulate from inquiry the removal of Negroes from a particular jury on the assumption that the prosecutor is acting on acceptable considerations related to the case he is trying, the particular defendant involved and the particular crime charged.

380 U.S. at 223, 13 L.Ed. 2d at 774.

The *Swain* Court said that it might be possible for a defendant to rebut the "presumption protecting the prosecutor" by showing that a prosecutor in a given county,

in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors . . . and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries . . . . If the State has not seen fit to leave a single Negro on any jury in a criminal case, the presumption protecting the prosecutor may well be overcome. Such proof might support a reasonable inference that Negroes are excluded from juries for reasons wholly unrelated to the outcome of the particular case on trial and that the peremptory system is being used to deny the Negro the same right and opportunity to participate in the administration of justice enjoyed by the white population. These ends the peremptory challenge is not designed to facilitate or justify.

380 U.S. at 223-24, 13 L.Ed. 2d at 774. The *Swain* Court noted that no black person had served on a petit jury in the county in question in either a civil or a criminal case since about 1950. The Court held this fact was not enough to show the state's denial of equal protection because both prosecutors and defendants participated in the jury selection process, and the record did not demonstrate the extent to which prosecutors alone caused this result.

*Batson* holds that facts surrounding the exercise of peremptory challenges in a single, given case may make a prima facie showing that the prosecutor is challenging blacks solely on the basis of race, thereby rebutting the presumption of regularity in the exercise of such challenges. *Batson* thus overrules *Swain*'s holding that more than one case must be examined in order for a defendant to make this showing. *Batson* also overrules the *Swain* holding that it is proper and not a violation of equal protection to challenge peremptorily blacks in a single, given case solely on the ground that such persons by reason of their race may harbor favorable biases toward defendants who are members of the same group.

This Court in *State v. Jackson*, 317 N.C. 1, 343 S.E. 2d 814 (1986), has concluded that *Batson* should not be applied retroactively and "will only be applicable to those cases where the jury selection took place after the *Batson* decision was rendered" on 30 April 1986. *Id.* at 21, 343 S.E. 2d at 826.

Defendants here do not, of course, rely on *Batson* for relief; and under our holding in *Jackson, Batson* can afford them no relief. They rely instead on an argument emanating from the Sixth Amendment's guarantee of an impartial jury, made applicable to the states through the Fourteenth Amendment. *See Taylor v. Louisiana,* 419 U.S. 522, 42 L.Ed. 2d 690 (1975); *Duncan v. Louisiana,* 391 U.S. 145, 20 L.Ed. 2d 491 (1968).

This argument is best expounded in *McCray v. Abrams,* 750 F. 2d 1113 (2nd Cir. 1984). The Second Circuit in *McCray* concluded that although *Swain* then controlled the question of the permissibility of peremptory challenges on the basis of race under the Equal Protection Clause, "[w]e are not . . . required to read *Swain* as setting the standards for all other provisions of the Constitution." 750 F. 2d at 1124. The Second Circuit relied on a number of United States Supreme Court cases decided after *Swain* and construing the Sixth Amendment's guarantee of an impartial jury to conclude first that a criminal defendant is entitled to a venire from which distinctive groups of persons have not been systematically excluded, in order to insure insofar as practicable that the venire represents a fair cross-section of the community. Second, the Court concluded the purpose of this fair cross-section requirement as to the venire is to give the defendant a fair possibility of being tried by a petit jury which itself is representative of the community. The Second Circuit recognized the Sixth Amendment as construed by the Supreme Court did not guarantee a petit jury fairly representative of the community, but it concluded that it did guarantee a defendant a fair chance at such a petit jury. The *McCray* Court went on to hold that a defendant could establish a prima facie violation of his right to the possibility of a representative petit jury by showing first, that the group alleged to have been excluded is a "cognizable group in the community" and second,

> there is a substantial likelihood that the challenges leading to this exclusion have been made on the basis of the individual venirepersons' group affiliation rather than because of any indication of a possible inability to decide the case on the basis of the evidence presented.

*Id.* at 1131-32.

Although most state courts have either adhered to the *Swain* approach or for other reasons have rejected the argument defendants make,[3] several state courts, whose cases were cited and relied on in *McCray*, have reached conclusions similar to that reach in *McCray* with regard to the peremptory challenge question on the basis of various jury trial guarantee provisions in their respective state constitutions. *People v. Wheeler*, 22 Cal. 3d 258, 583 P. 2d 748 (1978); *State v. Neil*, 457 So. 2d 481 (Fla. 1984); *Commonwealth v. Soares*, 377 Mass. 461, 387 N.E. 2d 499 (1979); *State v. Crespin*, 94 N.M. 486, 612 P. 2d 716 (N.M. App. 1980).

Defendants ask us to adopt the Second Circuit's Sixth Amendment analysis in *McCray* and, barring that, to interpret Article I, section 24 of the North Carolina Constitution, guaranteeing a criminal defendant the right to a jury trial, to preclude the state from challenging peremptorily prospective jurors solely on the basis of their race or group affiliation in any case.

We need not, however, reach in this case the question of whether we should employ under either the Sixth Amendment or Article I, section 24 of the North Carolina Constitution the fair cross-section analysis used by the Second Circuit in *McCray* and state courts in California, Florida, Massachusetts and New Mexico in the cases previously cited. The reason is that even under this analysis defendant must demonstrate from the facts surrounding the jury selection in his case "a substantial likelihood,"[4] "a strong likelihood,"[5] "a likelihood,"[6] or "it is likely,"[7] that jurors were peremptorily challenged solely because of their race or group affiliation rather than because of any particular bias in the given case. Even under *Batson*'s due process analysis defendant must show that the circumstances surrounding the prosecutor's exercise of peremptory challenges to remove members of defendant's race "raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Batson v. Kentucky*, 476 U.S. at ---, 90 L.Ed. 2d at 88.

---

3. These cases are collected in *State v. Neil*, 457 So. 2d 481, 484 n. 3 (Fla. 1984).

4. *McCray v. Abrams*, 750 F. 2d 1113, 1132 (2d Cir. 1984).

5. *People v. Wheeler*, 22 Cal. 3d 258, 280, 583 P. 2d 748, 764 (1978).

6. *Commonwealth v. Soares*, 377 Mass. 461, 490, 387 N.E. 2d 499, 517 (1978).

7. *State v. Neil*, 457 So. 2d 481, 485 (Fla. 1984).

In *McCray* the prosecutor had peremptorily challenged all blacks and Hispanics who had been tendered to the state when defendant's trial counsel objected, identifying several of these challenged venirepersons who were excused without any discernible reason to believe they would be biased. Thereafter only one black juror was eventually seated as an alternate. No blacks sat on the petit jury of twelve. The Second Circuit concluded these circumstances were enough to make out a prima facie showing of racially motivated peremptory challenges. Likewise in *Wheeler*, a case in which defendants were black and the victim white, the prosecutor peremptorily challenged every black called to the box resulting finally in a trial by an all-white jury. In *Soares*, another case in which the victim was white and defendants black, the prosecutor challenged twelve of thirteen prospective black jurors resulting in a jury of eleven whites and one black. In *Neil* both defendant and the victim were black. The state used its peremptories to remove all prospective black jurors from the petit jury of twelve. One black eventually sat as an alternate. The courts in *Wheeler, Soares* and *Neil* concluded, respectively, that defendants had made out at least prima facie cases of constitutionally impermissible racially motivated peremptory challenges. In *State v. Crespin*, 612 P. 2d 716 (N.M. App. 1980), however, the prosecutor peremptorily challenged the only prospective black juror in the venire. The Court held this fact was not enough to make out a prima facie case of a racially motivated peremptory challenge.

We are confident the circumstances surrounding the peremptory challenges in the instant case show no likelihood and raise no inference that the challenges were being exercised solely on account of race. As for the petit jury of twelve, the state passed as many blacks as it challenged. It challenged six black and five white prospective jurors. Four black jurors and eight white jurors finally sat on the petit jury of twelve, a result which closely paralleled the racial make-up of Cumberland County where the jurors were chosen.[8] As for alternate jurors, the state challenged two blacks and passed one. One black and one white alternate sat. The challenges complained of affirmatively demonstrate that con-

---

8. Cumberland County was 64.1 percent white and 30.77 percent black. County and City Data Book, Statistical Abstract Supp. 1983 (10th ed.). Defendant Belton, himself, challenged peremptorily two blacks who had been passed by the state but who were ultimately replaced by blacks ultimately passed by all parties.

cerns other than race must have motivated the prosecutor. We, therefore, overrule this assignment of error.

## C.

[5] Defendants next contend the prohibition against double jeopardy in the Fifth Amendment to the federal constitution[9] precludes them from being convicted for both the first degree kidnapping and first degree rape of Nunnery and White. For the reasons stated in our recent decision in *State v. Freeland*, 316 N.C. 13, 340 S.E. 2d 35 (1986), we agree.

Defendant Freeland was convicted of first degree kidnapping, rape and sex offense arising out of a single incident. We noted in *Freeland*:

> In his final mandate during the charge on first degree kidnapping the trial judge, among other things, instructed the jury that in order to find defendant guilty it must find that he had sexually assaulted [the victim]. The only sexual assaults committed by defendant against [the victim] were the rape and sexual offense for which he was separately convicted. Therefore, in finding defendant guilty of first degree kidnapping the jury must have relied on the rape or sexual offense to satisfy the sexual assault element. As a result defendant was unconstitutionally subjected to double punishment under statutes proscribing the same conduct. *See State v. Price*, 313 N.C. 297, 327 S.E. 2d 863 (1985) (proof of the rape not necessary to satisfy sexual assault element because defendant committed a separate sexual assault for which he was not prosecuted).

*Id.* at 21, 340 S.E. 2d at 39. Recognizing that the kidnapping statute made the rape an element of the first degree kidnapping, we held in *Freeland* the legislature, when it enacted the statute, did not intend for a defendant to be convicted and punished both for the elemental crime (the rape) and the crime of which it was an element (first degree kidnapping).[10] We remanded *Freeland* for

---

9. The Fifth Amendment's double jeopardy prohibition is applicable to the states through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 23 L.Ed. 2d 707 (1969).

10. *Id.* at 23, 340 S.E. 2d at 40-41. *But see State v. Gardner*, 315 N.C. 444, 340 S.E. 2d 701 (1986), where this Court reached a different result in the context of a

resentencing, suggesting that the trial court could either (1) arrest judgment on the first degree kidnapping conviction and resentence defendants for second degree kidnapping or (2) arrest judgment in either the rape or the sex offense convictions. For a similar result on similar facts see *State v. Mason*, 315 N.C. 724, 340 S.E. 2d 430 (1986).

As to both defendants and both victims the trial court instructed the jury that in order to convict of first degree kidnapping the jury must find, among other things, that the respective victim "had been sexually assaulted." With regard to the victim Nunnery, there was only one sexual assault, the first degree rape. Since the rape of Nunnery was the only sexual assault which could have formed the "sexual assault" element of the first degree kidnapping convictions involving her, under *Freeland* defendants could not be convicted and punished for both crimes.

Here Judge Johnson consolidated for judgment Belton's two convictions for first degree kidnapping with his conviction for first degree rape of White, the latter of which carries a mandatory life sentence. N.C.G.S. §§ 14-27.2(b) (1981); 14-1.1(a)(2) (1981). He did the same for Sadler's like convictions. He then sentenced both defendants to life imprisonment in their respective consolidated cases. Defendants' first degree kidnapping convictions, therefore, did not augment their sentences.

Nevertheless, we conclude defendants' *convictions* for both first degree kidnapping and rape violate the prohibition against double jeopardy found in the United States Constitution.

Where two crimes may not be punished because of the prohibition against double jeopardy, neither may convictions for both crimes stand. *Ball v. United States*, 470 U.S. 856, 84 L.Ed. 2d 740 (1985); *State v. Freeland*, 316 N.C. 13, 340 S.E. 2d 35; *State v. Midyette*, 270 N.C. 229, 154 S.E. 2d 66 (1967). In *Freeland* we said: "The general rule is that the double jeopardy clause of the Federal Constitution protects an individual ' "from being subjected to the hazards of trial and possible *conviction* more than once for an alleged offense." ' " *Freeland*, 316 N.C. at 21, 340 S.E. 2d at 39, *quoting Missouri v. Hunter*, 459 U.S. 359, 365, 74 L.Ed. 2d 535,

breaking and larceny case on the basis of what this Court perceived to be a different legislative intent.

542 (1983) (emphasis ours). *Midyette* held a defendant convicted of assault with a deadly weapon cannot also be convicted of resisting a public officer when the assault was the means by which the public officer was resisted. The United States Supreme Court said in *Ball* that, for double jeopardy purposes, " 'punishment' must be the equivalent of a criminal conviction and not simply the imposition of a sentence." 470 U.S. at 861, 84 L.Ed. 2d at 746.

We also find double jeopardy violations in defendants' convictions of crimes against the victim White. There is evidence that Sadler and Belton (Belton by reason of aiding and abetting) raped White twice and forced her to perform fellatio once but were indicted for and convicted of only one first degree rape and first degree sex offense against White.

The argument is made that since the unindicted rape of White could have been used by the jury to supply the "sexual assault" element of the White kidnapping, no double jeopardy violation results from convictions of both kidnapping and that rape of White for which defendants were indicted and convicted. The difficulty with this argument is that it requires this Court to assume the jury, without being instructed that it could do so, found unanimously beyond a reasonable doubt that defendants in fact committed a rape against White for which they were not indicted. Secondly, it requires us to assume the jury, again without being instructed that it could do so, used the unindicted rape of White to supply the sexual assault element in the crime of first degree kidnapping against White.

We are not at liberty to make such assumptions. In analogous situations when alternative theories of conviction have been available to a jury and it cannot be discerned from the jury instructions or the form of the verdict upon which theory the jury relied, this Court has held that it cannot assume the jury adopted a theory favorable to the state; instead, the Court has construed the ambiguity in favor of defendant.

In *State v. Silhan*, 302 N.C. 223, 275 S.E. 2d 450 (1981), the Court said:

> When a defendant is convicted of first degree murder pursuant to the felony murder rule, and a verdict of guilty is also returned on the underlying felony, this latter conviction

provides no basis for an additional sentence. It merges into the murder conviction, and any judgment imposed on the underlying felony must be arrested. [Citations omitted.] When, however, a defendant has been convicted of first degree murder on a theory of premeditation and deliberation and in the process commits some other felony, the other felony is not an element of the murder conviction although the other felony may be part of the same continuous transaction. Defendant may in such cases be sentenced upon both the murder conviction and the other felony conviction. *State v. Tatum*, 291 N.C. 73, 229 S.E. 2d 562 (1976). But when a jury is properly instructed upon both theories of premeditation and deliberation and felony murder, and returns a first degree murder verdict without specifying whether it relied on either or both theories, the case is treated as if the jury relied ujpon the felony murder theory for purposes of applying the merger rule. Judgment imposed on a conviction for the underlying felony must be arrested. *State v. McLaughlin*, 286 N.C. 597, 213 S.E. 2d 238 (1975), *death sentence vacated*, 428 U.S. 903 (1976).

*Id.* at 261-62, 275 S.E. 2d at 477-78.

Likewise, in *State v. Gardner*, 315 N.C. 444, 340 S.E. 2d 701 (1986), in determining whether defendant's conviction and sentencing for both felony breaking or entering and felony larceny violated the prohibition against double jeopardy, Justice Meyer, writing for the Court, made the following observation:

On the felony larceny charge, two felony theories were presented to the jury in the alternative — N.C.G.S. § 14-72(b) (2), breaking or entering, and N.C.G.S. § 14-72(a), property worth more than $400.00. The jury did not specify the theory it relied upon, and it would be pure speculation to suggest which theory it relied upon. We, therefore, for the purposes of deciding this case, construe this ambiguous verdict in favor of the defendant, *State v. Williams*, 235 N.C. 429, 70 S.E. 2d 1 (1952), and assume that the felony larceny verdict was predicated upon a finding that defendant committed the larceny pursuant to the breaking or entering. Thus, we assume that the predicate crime of breaking or entering was

used to raise the larceny charge to the compound crime of felony larceny.

*Id.* at 450-51, 340 S.E. 2d at 706.

Consistent with this position, in *State v. Moore*, 315 N.C. 738, 340 S.E. 2d 401 (1986), the Court reversed a conviction for kidnapping because we found that, of the three purposes for the restraint or removal of the victim which the jury was allowed to consider, one was not supported by the evidence. Although the other two purposes would have supported the conviction if the jury had indicated its reliance on either, we said:

> The jury did not indicate which of the three purposes that it was allowed to consider formed the basis for its verdict. Although two of the purposes which the jury was allowed to consider were supported by the evidence, we cannot say that the verdict was not based upon the purpose erroneously submitted.

*Id.* at 749, 340 S.E. 2d at 408.

The United States Supreme Court has long recognized that a conviction cannot stand merely because it could have been supported by one theory submitted to the jury if another, invalid theory also was submitted and the jury's general verdict of guilty does not specify the theory upon which the jury based its verdict. *Williams v. North Carolina*, 317 U.S. 287, 87 L.Ed. 279 (1942); *Stromberg v. California*, 283 U.S. 359, 75 L.Ed. 1117 (1931).

*State v. Price*, 313 N.C. 297, 327 S.E. 2d 863 (1985), runs counter to all of the above authorities. In *Price* defendant was convicted of first degree rape and first degree kidnapping based on evidence that he abducted, raped, and performed cunnilingus on the victim. Defendant was neither indicted for nor convicted of any offense based on the act of cunnilingus. Nevertheless, the Court held that since the jury might have relied on the cunnilingus to satisfy the sexual assault element of the kidnapping offense, "[p]roof of the rape was not required to satisfy this element of the crime. Therefore, no principle of double jeopardy was violated by entry of judgments that the defendant committed both rape in the first degree and kidnapping in the first degree." *Id.* at 305, 327 S.E. 2d at 868.

The holding on the double jeopardy issue in *Price* departs radically from the Court's theretofore consistently adopted view that appellate courts cannot assume, simply because the jury *could* have found a fact to exist, that it did so. We now decide that *Price* should no longer be considered authoritative on this question. Insofar as *Price* is inconsistent with our holding herein on the double jeopardy question, it is overruled.

In the present case, we cannot say that the jury's verdict of guilty of first degree kidnapping was based upon its finding beyond a reasonable doubt that the defendant Sadler raped Ms. White a second time, for there is nothing in the trial judge's instruction or in the jury's verdict to indicate that it made that finding. Because we cannot say that the jury's verdict of first degree kidnapping was based upon a sexual assault other than the ones forming the basis for the other two convictions, the verdict is ambiguous and must be construed in favor of the defendant.

The result is that defendants' convictions of both first degree kidnapping and rape against Nunnery cannot both stand. Their convictions of first degree kidnapping and *both* first degree rape and first degree sex offense against White cannot all stand. This is true even though the combination of convictions because of the manner in which they were consolidated for judgment resulted in no additional punishment attributable to any of the kidnapping cases.

We remand both defendants' cases to the trial court. That court may arrest judgment on both first degree kidnapping charges as to each defendant and enter instead two verdicts of guilty of second degree kidnapping as to each defendant and re-sentence defendants accordingly. In the alternative, the trial court may arrest judgments in the rape against Nunnery and the rape or sex offense against White as to each defendant and resentence defendants accordingly.

D.

[6] Defendants next challenge Judge Johnson's instructions to the jury that if in the rapes and sex offenses defendants employed a deadly weapon *or* were aided and abetted by another, they could be found guilty of first degree rape and first degree

sex offense. They argue that the charge given in the disjunctive enables the jury to render a nonunanimous verdict; that is, some jurors could find only that defendants used a deadly weapon and others only that they aided and abetted one another. This instruction, defendants claim, violated their right to a unanimous verdict.

This legal argument has been resolved against defendants in *State v. Creason*, 313 N.C. 122, 326 S.E. 2d 24 (1985), and *Jones v. All American Life Insurance Co.*, 312 N.C. 725, 325 S.E. 2d 237 (1985).

We further note in the case at bar that the jury unanimously found defendant Sadler guilty of the rape committed by Belton against Nunnery. Likewise it unanimously found defendant Belton guilty of the rape and sex offense committed by Sadler against White. The jury thus must have found unanimously that in the commission of each of these crimes each defendant was aided and abetted by the other.

There is, therefore, no merit in this assignment of error.

E.

[7] Finally, both defendants argue the trial court erred in failing to dismiss the kidnapping charges for insufficient evidence. They rely on *State v. Irwin*, 304 N.C. 93, 282 S.E. 2d 439 (1981), in which we held that an asportation which is an inherent and integral part of some crime for which defendant has been convicted other than the kidnapping will not support a separate conviction for kidnapping. *Irwin* involved the armed robbery of a store. During the course of the armed robbery the clerk forcibly was moved to the back of the store in order to facilitate the robbery. We held this asportation to be such an inherent and integral part of the robbery that it would not support a separate conviction for kidnapping.

*Irwin* is distinguishable from the case at bar. Here defendants accosted their victims on the military reservation at Fort Bragg, North Carolina. They then forced the victims at gunpoint into one of the victims' automobiles and traveled through rural areas for twenty to thirty minutes until at a deserted dirt road in the vicinity of Eureka Springs they raped and otherwise sexually assaulted their victims. Even if North Carolina has no jurisdiction

over crimes occurring on the Fort Bragg military reservation, as defendants argue, we can take judicial notice that Eureka Springs is some distance off the reservation and in Cumberland County. Defendants confined, restrained and removed their victims for some length of time while they drove from the military reservation to Eureka Springs in Cumberland County. This confinement, restraint, and removal was not an integral part of or inherently necessary for the commission of the crimes of rape and first degree sex offense.

We find no merit in this assignment of error.

### Conclusion

Except for the double jeopardy violations, we find no error in the trial of this case. Because of the double jeopardy violations, we remand the case to the trial court in order that a new sentencing hearing be conducted and sentences imposed in conformity with this opinion.

No error in trial; remanded for new sentencing hearing.

Justice MARTIN dissenting in part.

I respectfully dissent from part of the reasoning and conclusion of section III.C. of the majority's opinion.

Preliminarily, I note that on page 31 of its slip opinion the majority relies upon *State v. Midyette*, 270 N.C. 229, 154 S.E. 2d 66 (1967), without acknowledging that, in response to recent decisions of the Supreme Court of the United States, *Midyette* was expressly overruled by *State v. Gardner*, 315 N.C. 444, 454, 340 S.E. 2d 701, 708 (1986). *Accord State v. Freeland*, 316 N.C. 13, 23, 340 S.E. 2d 35, 41 (1986).

In the instant case the jury found that Belton and Sadler were both guilty of rape and kidnapping of the victim Nunnery. Because in each defendant's case the rape of Nunnery was the only possible "sexual assault" establishing the fifth element of kidnapping in the first degree, I agree under the *Freeland* and *Mason* cases (a) that either Belton's conviction of rape of Nunnery must be vacated or his conviction of kidnapping be reduced from kidnapping in the first degree to kidnapping in the second degree and (b) that either Sadler's conviction of rape of Nunnery must be

vacated or his conviction of kidnapping be reduced from kidnapping in the first degree to kidnapping in the second degree.

I disagree, however, with the majority's conclusions (a) that Belton's convictions of one count of rape of White, one count of sexual assault of White, and one count of kidnapping of White cannot stand simultaneously, and (b) that Sadler's convictions of one count of rape of White, one count of sexual assault of White, and one count of kidnapping of White cannot stand simultaneously. Had the record showed that the "sexual assault" of White which provided the fifth element of kidnapping in the first degree been either the crime of rape or of sexual offense of which each defendant was convicted separately, I would agree with the majority's conclusion. *See Freeland.* Here, however, there was substantial evidence of a second rape by Sadler of White with Belton aiding and abetting—of which rape neither defendant was convicted—which provided proof sufficient to establish the fifth element. White testified that after Sadler forced her at gunpoint to disrobe and to lie on the ground with her legs spread,

A. [H]e raped me.

Q. Did any part of him enter any part of you at that time?

A. Yes, sir.

Q. What part of him entered what part of you?

A. His penis entered my vagina.

Q. Was that with your consent?

A. No, sir, it was not.

. . . .

Q. What happened next?

A. He then, after a couple of minutes, he told me to spread my legs again and he raped me again vaginally.

This situation is virtually identical to that of *State v. Price*, 313 N.C. 297, 327 S.E. 2d 863 (1985), in which this Court held unanimously that evidence of an unindicted sexual assault of the victim was sufficient to support the fifth element of kidnapping in the first degree. This issue having been squarely considered and de-

cided by this Court just last year, it should not be so lightly over-ruled.

> The salutary need for certainty and stability in the law requires, in the interest of sound public policy, that the decisions of a court of last resort affecting . . . social values, deliberately made after ample consideration, should not be disturbed, under the doctrine of stare decisis, except for the most cogent reasons . . . .

1 Strong's N.C. Index 3d *Appeal and Error* § 69 (1976) (footnotes omitted). For this reason I dissent.

Justices MEYER and MITCHELL join in this dissenting opinion.

Justice MEYER dissenting in part.

I join in the dissent of Justice Martin. I am writing separately in order to register my dissatisfaction with the majority's treatment of the defendants' peremptory challenge claim. Specifically, I disagree with the mode of analysis employed by the majority in discussing the defendants' argument that the prosecutor's use of peremptory challenges to exclude blacks violated their sixth amendment right to an impartial jury selected from a fair cross-section of the community.

As the majority correctly notes, the defendants explicitly argue that this Court should adopt the reasoning of *McCray v. Abrams*, 750 F. 2d 1113 (2d Cir. 1984); *People v. Wheeler*, 22 Cal. 3d 258, 583 P. 2d 748 (1978); and *Commonwealth v. Soares*, 377 Mass. 461, 387 N.E. 2d 499 (1979), which hold that a prosecutor's use of peremptory challenges to remove jurors on the basis of race can constitute a violation of a defendant's right to a jury selected from a fair cross-section of the community. However, while devoting several pages to a discussion of the holdings in these cases, the majority concludes that it is unnecessary to reach a decision as to whether to adopt the *McCray-Wheeler-Soares* fair cross-section analysis due to the fact that the defendants have failed to make out a prima facie showing of racially motivated peremptory challenges. I believe that this treatment constitutes an abdication of this Court's responsibility as the highest appellate court in this State to *completely* adjudicate *all* issues which are properly presented to it. I realize that there are times that a

court may wish to "side step" an important issue when the briefs and oral arguments fail to do the issue justice. Such is not the case here. The briefs on this issue by counsel for both defendants are excellent. This Court was presented with a request to adopt a new method of analyzing fair cross-section claims. This request was accompanied by scholarly, well-researched, well-written briefs. This issue is squarely before us. I think it is incumbent upon this Court to expressly adopt or reject the contention made by these defendants. The majority's lengthy discussion of the question, and its ultimate failure to decide it, accomplishes virtually nothing. Of course, the one thing it does accomplish is to preserve decision on the issue for a future case presenting the same argument in the context of "death qualification" of the jury, thus presenting an opportunity to eviscerate our death penalty statute.

Having criticized the majority for its failure to explicitly adopt or reject the *McCray-Wheeler-Soares* fair cross-section analysis, I now set out my position on this question. I am of the opinion that the fair cross-section analysis utilized in those cases should be rejected by this Court. My opinion is based on several factors.

Initially, I am convinced that the sixth amendment fair cross-section analysis set forth in *McCray* has been completely eviscerated by the ruling of the United States Supreme Court in *Lockhart v. McCree*, --- U.S. ---, 90 L.Ed. 2d 137 (1986). In that case the defendant argued that the removal for cause of jurors unalterably opposed to the death penalty prior to the guilt-innocence determination phase of a bifurcated capital trial violated his sixth amendment right to have a jury selected from a representative cross-section of the community. The Court refused to utilize the fair cross-section requirement to invalidate the use of either for-cause or peremptory challenges and reaffirmed the well-settled principle that the fair cross-section guarantee does not require that petit juries—as opposed to jury venires—reflect the composition of the community at large. *Id.* at ---, 90 L.Ed. 2d at 147-48. *See also Taylor v. Louisiana*, 419 U.S. 522, 42 L.Ed. 2d 690 (1975). The ultimate holding in *McCray*—that the use of peremptory challenges may constitute a violation of a defendant's sixth amendment right to a jury drawn from a fair cross-section of the community—was emphatically rejected by the Supreme Court in

*McCree.* This is clearly in accord with the holdings of the majority of courts which have addressed the issue that a prosecutor's use of peremptory challenges to exclude minorities from the petit jury does not infringe upon the fair cross-section requirement. *See, e.g., United States v. Whitfield,* 715 F. 2d 145 (4th Cir. 1983); *United States v. Childress,* 715 F. 2d 1313 (8th Cir. 1983), *cert. denied,* 464 U.S. 1063, 79 L.Ed. 2d 202 (1984); *Weathersby v. Morris,* 708 F. 2d 1493 (9th Cir. 1983), *cert. denied,* 464 U.S. 1046, 79 L.Ed. 2d 181 (1984); *Willis v. Zant,* 720 F. 2d 1212 (11th Cir. 1983), *cert. denied,* 467 U.S. 1256, 82 L.Ed. 2d 849 (1984); *Allen v. Hardy,* 586 F. Supp. 103 (N.D. Ill. 1984); *State v. Wiley,* 144 Ariz. 525, 698 P. 2d 1244 (1985); *Doepel v. United States,* 434 A. 2d 449 (D.C. App.), *cert. denied,* 454 U.S. 1037, 70 L.Ed. 2d 483 (1981); *Blackwell v. State,* 248 Ga. 138, 281 S.E. 2d 599 (1981); *People v. Williams,* 97 Ill. 2d 252, 454 N.E. 2d 220 (1983), *cert. denied,* 466 U.S. 981, 80 L.Ed. 2d 836, *reh'g denied,* 467 U.S. 1268, 82 L.Ed. 2d 864 (1984); *State v. Williams,* 458 So. 2d 1315 (La. App. 1984), *writ denied,* 463 So. 2d 1317 (La. 1985); *Nevius v. State,* 101 Nev. 238, 699 P. 2d 1053 (1985); *State v. Raymond,* 446 A. 2d 743 (R.I. 1982).

Furthermore, I do not believe that article I, section 24 of the North Carolina Constitution should be interpreted in such a manner as to adopt the *McCray-Wheeler-Soares* cross-section analysis —the distinct minority view. I am of the opinion that the analysis employed in *McCray, Wheeler,* and *Soares* has the practical effect of extending the fair cross-section requirement to the petit jury. These cases acknowledge that the Supreme Court has never extended the fair cross-section requirement to the petit jury, but conclude that the requirement does guarantee a defendant a "fair chance" at such a jury. The sixth amendment and article I, section 24 of the North Carolina Constitution do guarantee a defendant a "fair chance" at a jury selected from a representative cross-section of the community. This right, however, is protected not by extension of the fair cross-section requirement to the petit jury, but through the effective protections afforded in the selection of the venire, the large number in the jury venire, and the limited peremptory challenges. Through these protections, both parties are accorded a fair opportunity to select an impartial and representative jury. The possibility that a prosecutor will systematically eliminate a defendant's "fair chance" at a representative cross-section by systematically removing blacks or other racial

minorities—*McCray*'s ultimate concern—has been eliminated by the holding in *Batson v. Kentucky*, --- U.S. ---, 90 L.Ed. 2d 69 (1986), alluded to in the majority opinion.

This Court has never construed article I, section 24 of the North Carolina Constitution as extending the fair cross-section requirement to the petit jury. Several considerations counsel against doing so. First, because the venire is drawn from random lists, it is inevitable that there will be times when the list will include but a few members of a particular group. If the fair cross-section requirement were extended to the petit jury, the selection of individuals of that group to serve as jurors might be necessary. This process of individual selection would be fraught with the potential for abuse and the appearance of impropriety and partiality. Second, a requirement that the petit jury actually mirror the community would create an administrative nightmare. Third, assigning jurors as representatives of specific groups might influence the deliberative process by accentuating identifiable differences among jurors. Fourth, it is conceivable that a prospective juror who evidences an actual, specific bias could not be excluded if his removal would destroy the representative cross-section. *See* Note, *Limiting the Peremptory Challenge: Representation of Groups on Petit Juries*, 86 Yale L.J. 1715 (1977).

For these reasons, I would vote to expressly reject the defendants' argument under both the United States Constitution and the North Carolina Constitution.